**TRANSCOM, INC., Plaintiff–Appellant,**

and

**L & S Bearing Company, Plaintiff,**

v.

**UNITED STATES, Defendant–Appellee,**

and

**The Timken Company, Defendant.**

No. 98–1401.

United States Court of Appeals,
Federal Circuit.

Decided June 16, 1999.

Mark A. Cohen, Cohen, Darnell & Cohen, P.L.L.C., of Dallas, Texas, for plaintiff L & S Bearing Company.

George W. Thompson, Neville, Peterson & Williams of Washington, DC, argued for plaintiff-appellant, Transcom, Inc. With him on the brief was John M. Peterson.

Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant-appellee, United States. With him on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Of counsel were Stephen J. Powell, Elizabeth C. Seastrum and Linda S. Chang, Attorneys, U.S. Department of Commerce, of Washington, DC.

James R. Cannon, Jr., Stewart and Stewart, of Washington, DC, argued for defendant-appellee, The Timken Company. With him on the brief were Terence P. Stewart and Amy S. Dwyer.

Before PLAGER, RADER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

In 1987, the Department of Commerce issued an antidumping order with respect to tapered roller bearings imported from the People's Republic of China. Commerce subsequently conducted annual administrative reviews of that order. Appellant Transcom, Inc., an importer of Chinese tapered roller bearings, challenges the antidumping duties assessed against it in connection with the fourth, fifth, and sixth administrative reviews of the antidumping order (for 1990–91, 1991–92, and 1992–93). Transcom points out that several of the Chinese companies from which it obtained tapered roller bearings were not named in the notices of initiation for those three administrative reviews. For that reason, Transcom argues, it was improper for the administrative reviews to result in an increase in the antidumping duty on those companies' products. We agree with Transcom that Commerce did not provide adequate notice that the unnamed exporters' products would be subject to the administrative reviews, and we therefore reverse the judgment of the Court of International Trade.

I

In 1986, when the Commerce Department began its investigation of tapered roller bearings from the People's Republic of China, the state-controlled entity China National Machinery and Equipment Import and Export Corporation (CMEC) was the sole Chinese exporter of tapered roller bearings. At that time, all tapered roller bearings that were imported from China into the United States were sourced, either directly or indirectly, through a Hong Kong trading company, Premier Bearing and Equipment, Limited (Premier). Following an investigation, the issuance of an antidumping duty order, and a court challenge to that order, Commerce established an antidumping duty rate of 4.69% for CMEC, a rate of 0.97% for Premier, and an "all others" rate of 2.96% applicable to other potential resellers of tapered roller bearings from China.

The antidumping order was subjected to an administrative review each year after its issuance. In the first two annual reviews, Commerce named only Premier and CMEC in the notices of initiation. In the third annual review, however, several other Chinese exporters requested that they be treated separately from CMEC. Commerce accordingly sent antidumping duty questionnaires to those companies and reviewed each of the parties that provided responses. In the final results of the third

review, Commerce concluded that CMEC no longer held a monopoly on the exportation of tapered roller bearings from China. Commerce thus assigned separate antidumping duty rates to each of the eight participating companies, including CMEC. For all other exporters, the Commerce Department selected an "all others" duty rate of 8.83%, which was reduced to the previous "all others" rate of 2.96% following a court challenge.

In June 1991, Commerce published a notice of opportunity to request an administrative review for the fourth period of review of the antidumping order. A request for review was received from the Timken Company, a United States bearings producer. In its request, the Timken Company asked that the Department review all merchandise covered by the order, and it listed 43 companies known to Timken to be sources of tapered roller bearings from China. Commerce subsequently published notices of initiation in which it stated that it was initiating an administrative review of the tapered roller bearings antidumping order and then listed the 43 companies Timken had identified in its request for review. Commerce sent questionnaires to all of the companies listed in the notices of initiation. Some of those companies responded to the questionnaires and some did not.

The same procedure was followed in the case of the fifth and sixth annual reviews, in which Commerce identified the same 43 companies in connection with the notices of initiation of the reviews. The Chinese exporters whose products are at issue in this case were not named in the notices of initiation for any of the three reviews at issue here, and they were not sent questionnaires in connection with those reviews.

Commerce consolidated the fourth, fifth, and sixth periods of review for the purpose of announcing its decisions. In the preliminary results for those three periods, Commerce found dumping margins for each of the companies that had responded to its

questionnaires. For companies that had been sent questionnaires but had not responded, Commerce stated its intention to apply the "best information available" (BIA) rate. For all other Chinese exporters, which had not been identified in the notices of initiation or been sent questionnaires, Commerce announced that it intended to apply the "PRC rate" of 23.76%, which was same as the "best information available" rate, *i.e.*, the rate assigned to companies that had been identified as subject to the review but had refused or been unable to provide information requested by Commerce in connection with the review. As proposed by Commerce, the "PRC rate" would apply to any supplier that had not established its independence from the state-controlled entity, including each of Transcom's suppliers that had not participated in the three administrative reviews under consideration.

In response to the preliminary results, Transcom entered an appearance and filed a brief in which it argued that Commerce had no authority to conduct a review of entries from exporters that were not named in the notices of initiation. Transcom argued that because those exporters were not subject to the reviews, entries from those exporters should be liquidated at the amount of the antidumping duties that were deposited at the time of entry, pursuant to 19 U.S.C. § 1675(a) and 19 C.F.R. § 353.22 (1991). The proper antidumping duty rate for such goods, Transcom argued, was the "all others" rate established in the initial investigation, *i.e.*, 2.96%.

In its final review results, Commerce rejected Transcom's argument that the unnamed exporters were outside the scope of the fourth, fifth, and sixth reviews. Commerce explained that it presumed all Chinese producers and exporters to be part of a single state-controlled enterprise and that the companies named in the notices of initiation were required to prove their independence from the state-controlled entity in order to receive a separate antidump-

ing duty rate. Because some of the named companies had failed to prove their independence, Commerce concluded that the state-controlled entity was covered by all three reviews. And because the unnamed exporters had not proved their independence from the state-controlled entity, Commerce announced that the unnamed exporters were considered to be part of the state-controlled entity and would be treated, for antidumping purposes, just like those companies that had been named in the initiation orders but had failed to prove that they should be accorded separate treatment. Commerce therefore rejected Transcom's argument that because its suppliers had not been named in the notices of initiation for the fourth, fifth, and sixth review periods, those suppliers could not be assigned the "best information available" rate that was assigned to the named companies that had failed to demonstrate their right to separate treatment. In the final results, Commerce settled on 8.86% as the "PRC rate" applicable to the Transcom suppliers that had not been named in and had not participated in the three annual reviews.

Transcom filed an action in the Court of International Trade challenging Commerce's decision, but the court upheld Commerce's ruling. In the court's view, Commerce's treatment of the unnamed exporters was justified as a logical extension of the presumption of state control that applies to companies in a nonmarket economy country such as China. Although the unnamed exporters had not been given direct notice of the reviews, the court nonetheless concluded that the presumption of state control was applicable to them and that, not having participated in the reviews and overcome that presumption, they were subject to the same antidumping rates that applied to the other companies that had failed to demonstrate their independence from the state-controlled entity.

## II

Transcom renews its argument that because the exporters from which it obtained tapered roller bearings were not named in the fourth, fifth, and sixth administrative reviews, it was improper for Commerce to apply the 8.86% "PRC rate" for bearings that Transcom obtained from those unnamed exporters. Because Commerce did not make clear that the unnamed exporters' goods were subject to those reviews, Transcom argues that it had no reason to believe it was required to demonstrate that the unnamed exporters were independent of the state-controlled entity in order to avoid having the 8.86% rate (the highest antidumping rate in any of the three reviews) applied to their products. We agree with Transcom that the procedure followed by Commerce in this case was flawed and that it was improper to impose the 8.86% "PRC rate" on products that Transcom obtained from the unnamed exporters.

## A

■ At the outset, the government argues that Transcom has no right to complain about the alleged lack of notice with regard to the unnamed exporters. Under the antidumping laws, the government contends, an importer of goods may not raise the notice issue because an importer agrees in advance to pay whatever antidumping duties are ultimately assessed on those goods. *See* 19 U.S.C. § 1673g(b)(4). But the fact that a party agrees to abide by the results of an administrative determination does not mean that the party has no right to complain of irregularities in the proceeding leading to that determination. As this court held recently in *NEC Corp. v. United States,* 151 F.3d 1361, 1371 (Fed. Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1029, 143 L.Ed.2d 39 (1999), an importer that is directly affected by an administrative determination of the proper antidumping duties is entitled to complain of procedural flaws in the administrative proceeding in which that determination was made. Transcom is therefore entitled to raise the notice issue in this proceeding.

## B

■ On the merits, we need not address Transcom's argument that the lack of notice of the scope of the administrative reviews violated Transcom's rights under the due process clause of the Fifth Amendment to the Constitution, because we hold that Commerce's conduct in this case violated Commerce's statutory and regulatory notice obligations in connection with the administrative reviews. *See NEC Corp.*, 151 F.3d at 1371 (declining to reach the constitutional question because the procedural issue could be resolved on other grounds).

Section 1675 of Title 19 provides for administrative reviews of antidumping duty orders. The Commerce Department may review an order upon request "after publication of notice of such review in the Federal Register." 19 U.S.C. § 1675(a). The regulation applicable to the administrative reviews at issue in this case states that an interested party "may request in writing that the Secretary conduct an administrative review of specified individual producers or resellers covered by an order." 19 C.F.R. § 353.22(a) (1991). That regulation also requires the Secretary to "publish in the Federal Register notice of 'Initiation of Antidumping Duty Administrative Review'" and to "send to appropriate interested parties or a sample of interested parties questionnaires requesting factual information for the review." 19 C.F.R. § 353.22(c) (1991). If no antidumping review is requested with respect to a particular order or with respect to particular merchandise, the regulation provides that antidumping duties will be collected on the unspecified merchandise in the amount of the cash deposit paid at the time of importation. *See* 19 C.F.R. § 353.22(e)(2) (1991); 19 U.S.C. § 1504(a); *see also Federal–Mogul Corp. v. United States*, 822 F.Supp. 782, 787–88 (CIT 1993) ("[T]he statutory framework for administrative reviews clearly anticipates that in cases where a company makes cash deposits on entries of merchandise subject to antidumping duties, and no administrative review of those entries is requested, the cash deposit rate automatically becomes that company's assessment rate for those entries."); *Floral Trade Council v. United States*, 822 F.Supp. 766, 768–71 (CIT 1993) (the "all others" rate established in the original investigation remains the antidumping duty rate for companies that were subject to the "all others" rate and were not reviewed in a subsequent administrative review); *UCF America, Inc. v. United States*, 870 F.Supp. 1120, 1126–28 (CIT 1994) (same).

The notification requirement in the statute and the Customs regulations serves to notify any interested party that the antidumping rate on goods obtained from exporters named in the notice of initiation for an administrative review may be affected by the outcome of that review. Thus, Transcom and other importers knew at the time of the notice of initiation that any bearings they purchased for importation from one of the named exporters would be subject to a revised antidumping rate for a particular review period. So apprised, Transcom or the other importers could participate in the administrative review in an effort to ensure that the calculation of antidumping duties on those products was correct. Transcom argues, however, that there was nothing in the statute, the regulations, the notices of initiation, or any prior statement of policy by Commerce that would have provided notice to Transcom or any other interested party that the antidumping rate on goods obtained from exporters who were not named in the notices of initiation would also be affected by the administrative reviews. Because of the absence of such notice, Transcom argues that it was improper for Commerce to assess an 8.86% antidumping duty on products that Transcom obtained from unnamed exporters during the fourth, fifth, and sixth administrative review periods.

Transcom is correct that none of the notices of initiation for the fourth, fifth, and sixth administrative reviews referred

to the unnamed exporters. Nor does it appear that Commerce notified the unnamed exporters or any other parties that the antidumping duties on the unnamed exporters' goods would be affected by the outcome of the administrative reviews. If the administrative reviews had been for products from a market economy country, the scope of the reviews would have been limited to those exporters named in the notices of initiation. The government argues, however, that the case is different for nonmarket economy countries such as the People's Republic of China. Because the tapered roller bearing order involved a nonmarket economy country, the government argues, Commerce was not required to identify the unnamed exporters in the notices of initiation in order for those exporters' products to be subject to the antidumping determinations made pursuant to those administrative reviews.

The government bases its argument on Commerce's methodology for calculating antidumping duties for nonmarket economy countries. Because all exporters in a nonmarket economy country are presumed to be part of the state-controlled entity, the government contends that if any company named in the administrative review is found to be part of the state-controlled entity, the effect of that finding is to bring within the scope of the review any other exporters from that country that fail to demonstrate their independence from the state-controlled entity. According to the government, if the unnamed exporters wished to avoid having the PRC rate applied to their exports, they should have voluntarily participated in the reviews and demonstrated their independence from the nonmarket economy entity.

The problem with the government's approach to the issue of the scope of the administrative review is that Transcom had no reason to expect that the antidumping duties on its exporters' products could be affected by proceedings in which the exporters were not named as parties. Neither the statute nor Commerce's regulations gave any hint that such a procedure would be used. Moreover, at the time of the administrative reviews at issue in this case, Commerce had not announced that it would be following a different practice with respect to unnamed exporters in administrative reviews of products from nonmarket economy countries, and in cases arising from administrative reviews conducted during the same period, the Court of International Trade held that parties not named in a notice of initiation and not sent questionnaires are not within the scope of an administrative review. *See Federal–Mogul Corp. v. United States*, 822 F.Supp. 782, 788 (CIT 1993); *Sigma Corp. v. United States*, 841 F.Supp. 1255, 1261–64 (CIT 1993); *Sigma Corp. v. United States*, 841 F.Supp. 1275, 1283–84 (CIT 1993); *D & L Supply Co. v. United States*, 841 F.Supp. 1312, 1316 (CIT 1993); *Federal–Mogul Corp. v. United States*, 862 F.Supp. 384, 400 (CIT 1994).

In light of the general rule that exporters not named in a notice of initiation are not affected by the outcome of the administrative review, the government acknowledges that if this case had been the first in which the government had enunciated the nonmarket economy presumption, it could "well be argued" that it would be inappropriate for the government to "resort[ ] to BIA for companies which were not specifically listed in the notice of initiation and not issued their own questionnaires," since those parties would have had "no actual or constructive notice that Commerce would treat [nonmarket economy] companies differently than market economy companies." That concession is consistent with decisions of the Court of International Trade. *See British Steel plc v. United States*, 879 F.Supp. 1254, 1317 (CIT 1995) (Commerce could not adopt tying presumption for the first time in final determinations without giving interested parties notice and an opportunity to submit evidence to rebut the presumption); *Sigma Corp.*, 841 F.Supp. at 1267 (improper for Commerce to shift from applying a company-specific margin

to a country-wide margin without notice to importer). The government contends, however, that Transcom and the unnamed exporters had constructive notice that Commerce considered all Chinese entities as subject to being affected by the administrative reviews, based on Commerce's January 1991 decision in *Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 56 Fed.Reg. 2742 (Jan. 24, 1991).

In the *Iron Construction Castings* case, Commerce applied a presumption of state government control to nonmarket economy countries and determined that if an exporter failed to demonstrate its independence from the state-controlled entity, a single, country-wide rate would be applied to the exporter's goods. The *Iron Construction Castings* case, however, did not address the question whether the single country-wide rate could be applied to companies that were not listed in the notice of initiation for the administrative review. Although Commerce sought to apply the country-wide antidumping rate to one company that was not named in the notice of initiation in the *Iron Construction Castings* case, no mention of that company or the legal issue regarding its proper antidumping rate was made in Commerce's published 1991 decision in that case. Moreover, when the final determination in *Iron Construction Castings* was reviewed by the Court of International Trade, the court refused to apply the country-wide rate to the exporter that had not been named in the notice of initiation for the administrative review. Absent notice and an opportunity to establish its independence from the state-controlled entity, the court held that it was improper to apply a country-wide rate based on the "best information available" rate that was applied to companies that had been notified of the review but had refused to cooperate with Commerce's investigation. *See Sigma Corp.*, 841 F.Supp. at 1264. The *Iron Construction Castings* case therefore did not provide the kind of notice that would

be necessary to make clear that the fourth, fifth, and sixth administrative reviews in this case could affect the unnamed exporters' products even though the unnamed exporters were not listed in any of the notices of initiation.

Following the administrative reviews in this case, Commerce began stating in notices of initiation of administrative reviews of the tapered roller bearing antidumping order that all unnamed exporters of tapered roller bearings from the People's Republic of China are conditionally covered by the review or, more explicitly, that if one of the named companies does not qualify for a separate rate, all other exporters that have not qualified for a separate rate are deemed to be covered by the review as part of the single Chinese entity of which the named exporters are a part. We need not decide whether those statements would constitute sufficient notice of the administrative review to the unnamed exporters, and thus sufficient notice to the importer of those exporters' goods, to satisfy the statutory and regulatory notification requirements. It is enough to note that such statements go far beyond any notice, constructive or otherwise, given to the unnamed exporters (and, by extension, to Transcom) in this case.

We do not mean to suggest that Commerce is required to give personal notice to any party that could be affected by an administrative review that its interests may be at stake. *See Goldhofer Fahrzeugwerk GmbH & Co. v. United States*, 885 F.2d 858, 860 (Fed.Cir.1989) (holding bulletin notice of liquidation sufficient; mailed notice not required); *United States v. Priority Prods., Inc.*, 793 F.2d 296, 301 (Fed. Cir.1986) (upholding sufficiency of constructive notice of penalty proceedings). What the statutory and regulatory notification provisions require is that any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced Commerce Department policy, whether partic-

ular entries in which it has an interest may be affected by the administrative review. That requirement was not satisfied in this case.

### C

The Court of International Trade acknowledged that Commerce's decision to apply the "PRC rate" to exporters not named in the administrative reviews "ostensibly conflicts with Commerce's regulation requiring a review of only specified individual producers and deprives unnamed parties of the opportunity to assert their individual independence." Nonetheless, the court departed from its previous disapproval of such an approach based on its reading of this court's decision in *Sigma Corp. v. United States,* 117 F.3d 1401 (Fed.Cir.1997). That case, the Court of International Trade concluded, justified Commerce's practice of subjecting unnamed exporters to a country-wide rate established in the administrative reviews, even though those exporters were not made parties to the reviews by being included in the notices of initiation.

We do not agree with the government and the Court of International Trade that this court's decision in *Sigma* supports Commerce's treatment of the unnamed exporters in this case. In the *Sigma* case, we stated:

> We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control. The antidumping statute recognizes a close correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources. *See* 19 U.S.C. § 1677(18)(B)(iv), (v). Moreover, because exporters have the best access to information pertinent to the "state control" issue, Commerce is justified in placing on them the burden of showing the lack of state control.

*Id.* at 1405–06. While we upheld the presumption of state control in *Sigma,* we did not address the question whether the presumption could be applied to exporters not named by Commerce in the notice of initiation of an administrative review, as that issue was not presented on appeal.

In applying the presumption of state control to include companies within the scope of the administrative reviews even though they were not named in the notices of initiation, the Court of International Trade stated that any other result would render the presumption "impotent." The government agrees, arguing that if Commerce were not allowed to assign a country-wide rate, the state-controlled entity in a case such as this one could simply export through the unnamed companies, which have a lower antidumping rate and which are presumed to be mere branches of the state-controlled entity. In addition, the government argues that when the unnamed companies have the benefit of a low cash deposit rate, the state-controlled entity would have no incentive to respond to Commerce's requests for information on behalf of those presumed branches that were not named in the notices of initiation.

■ While these are legitimate concerns, they do not justify a change in Commerce's regulatory procedures that was not announced until it was too late for Transcom or the unnamed exporters to submit evidence to demonstrate the exporters' independence from the state-controlled entity. Although in *Sigma* we upheld Commerce's presumption of state control, which shifted the burden to the companies under review to demonstrate that they were independent from the state-controlled entity, we recognized that the presumption is rebuttable, and that a party that is subject to the presumption has a right to attempt to rebut it. Yet if that party does not have notice that its interests are at stake in a particular administrative review, it has no meaningful opportunity to rebut the presumption.

Commerce may be free to choose a variety of means to give reasonable notice that certain exporters' goods are subject to an administrative review, but before taking action that significantly affects parties such as Transcom, it must provide some form of notice that the administrative review may result in an increase in the importer's liability by affecting the antidumping duty rates applicable to its foreign exporters. Because no such notice was provided in this case, the final results of the fourth, fifth, and sixth administrative reviews of the tapered roller bearing antidumping order cannot be sustained as they apply to the entries derived from Transcom's unnamed exporters.

Each party shall bear its own costs for this appeal.

*REVERSED and REMANDED.*