**Slip Op. 02-18**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD K. EATON, JUDGE**

---

|  |  |  |
|---|---|---|
| **ELKEM METALS CO.; AMERICAN ALLOYS, INC.; APPLIED INDUSTRIAL MATERIALS CORP.; and CC METALS & ALLOYS, INC.,** | : | |
| | : | |
| Plaintiffs/Plaintiff-Intervenors, | : | |
| and | : | |
| **GLOBE METALLURGICAL, INC.,** | : | |
| Plaintiff-Intervenor, | : | |
| v. | : | **Consol. Court No. 99-10-00628** |
| **UNITED STATES OF AMERICA** | : | |
| Defendant, | : | |
| and | : | |
| **FERROATLANTICA DE VENEZUELA; GENERAL MOTORS CORP.; ASSOCIAÇÃO BRASILEIRA DOS PRODUCTORES DE FERROLIGAS E DE SILICO METALICO, et al.; and RONLY HOLDINGS, LTD., et al.,** | : | |
| Defendant-Intervenors. | : | |

---

Plaintiffs, domestic producers of ferrosilicon, moved for judgment upon agency record in action challenging United States International Trade Commission's ("ITC") reconsideration and reversal of final affirmative material injury determination. Plaintiffs claimed: (1) ITC did not possess authority to reconsider final affirmative material injury determination; and (2) if ITC possessed such authority, the reconsideration proceedings were improperly conducted because, among other reasons, ITC failed to hold hearing as provided in published procedures that were to govern such proceedings. ITC and defendant-intervenors argued: (1) ITC had inherent authority

to reconsider original final affirmative material injury determination; and (2) ITC's reconsideration proceedings were properly conducted, in that the ITC was not required to conduct a hearing because Plaintiffs did not request one. The Court of International Trade, Eaton, J., held: (1) ITC had authority to reconsider final affirmative material injury determination; and (2) ITC failed to adhere to published procedures that were to govern its reconsideration proceedings; and, therefore, reconsideration proceedings were conducted in a manner not in accordance with law.

[Case remanded to ITC for further action consistent with this opinion.]

Decided: February 21, 2002

*Verner, Liipfert, Bernhard, McPherson and Hand* (*William D. Kramer*); *Eckert Seamans Cherin & Mellott, LLC* (*Dale Hershey* and *Mary K. Austin*), for Plaintiff Elkem Metals Company.

*Doepken, Keevican & Weiss* (*Gordon W. Schmidt*), for Plaintiff American Alloys, Inc.

*Altheimer & Gray* (*Theodore J. Low*), for Plaintiff Applied Industrial Materials Corporation.

*Arent Fox Kintner Plotkin & Kahn, PLLC* (*Stephen L. Gibson*, *George R. Kucik*, and *Nada S. Sulaiman*), for Plaintiff CC Metals and Alloys, Inc.

*Dangel & Fine, LLP* (*Edward T. Dangel, III*, *Michael K. Mattchen*, and *Jonathan L. Glover*), for Plaintiff-Intervenor Globe Metallurgical, Inc.

*Lyn M. Schlitt*, General Counsel, United States International Trade Commission; *James M. Lyons*, Deputy General Counsel, United States International Trade Commission (*Marc A. Bernstein*), for Defendant.

*Kaye, Scholer, Fierman, Hays & Handler, LLP* (*Julie C. Mendoza*, *Donald B. Cameron*, *R. Will Planert*, and *Margaret E. Scicluna*), for Defendant-Intervenor Ferroatlantica de Venezuela.

*Hogan & Hartson LLP* (*Mark S. McConnell* and *Jonathan J. Engler*), for Defendant-Intervenor General Motors Corporation.

*Dorsey & Whitney LLP* (*Philippe M. Bruno* and *Kevin B. Bedell*), for Defendant-Intervenors Associação Brasileira dos Productores de Ferroligas e de Silico Metalico, Companhia Brasileira Carbureto de Calcio-CBCC, Companhia de Ferroligas de Bahia-FERBASA, Nova Era Silicon S/A, Italmagnesio S/A-Industria e Comercio, Rima Industrial S/A, and Companhia

Ferroligas Minas Gerais-Minasligas.

*Aitken Irvin Berlin & Vrooman, LLP* (*Bruce Aitken* and *Virginie Lecaillon*), for Defendant-Intervenors Ronly Holdings, Ltd., Cheliubinski Electrometalurgical Works, Kuznetsk Ferroalloy Works, Stakhanov Ferroalloy Works, and Zaporozhye Ferroalloy Works.

## OPINION & ORDER

**EATON, Judge:** Before the court are the motions of plaintiffs Elkem Metals Company, American Alloys, Inc., Applied Industrial Materials Corporation ("AIMCOR"), and CC Metals and Alloys, Inc. ("CCMA"), and plaintiff-intervenor Globe Metallurgical, Inc. ("Globe") (collectively "Plaintiffs"), for judgment upon the agency record pursuant to USCIT R. 56.2. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c); 19 U.S.C. § 1516a(a)(2)(B)(ii). For the reasons set forth below, the court remands this case to the United States International Trade Commission ("ITC") for further action consistent with this opinion.

## BACKGROUND

Plaintiffs challenge the ITC's reconsideration and reversal of its final affirmative material injury determinations in antidumping investigations Nos. 731-TA-566-570 and 731-TA-641 (Final) covering ferrosilicon[1] from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela and countervailing duty investigation No. 303-TA-23 (Final) covering ferrosilicon from Venezuela ("Final Determination").

---

[1] Ferrosilicon is an iron alloy used in the production of steel and cast iron. See Ferrosilicon from Brazil, Kazakhstan, People's Republic of China, Russia, Ukraine, and Venezuela, 64 Fed. Reg. 51,097, 51,097 (Sept. 21, 1999).

In 1993 and 1994, shortly after the United States International Trade Administration found that ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela was being sold in the United States at less than fair value, and that the Venezuelan government was subsidizing ferrosilicon sales, the ITC determined that such sales were causing material injury to the ferrosilicon industry in the United States. It then issued the Final Determination, the reconsideration and reversal of which is the subject of this dispute. Based on the Final Determination, the United States Department of Commerce ("Commerce") issued antidumping orders against ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, and a countervailing duty order against ferrosilicon from Venezuela. See Antidumping Duty Order: Ferrosilicon From the People's Republic of China, 58 Fed. Reg. 13,448 (Mar. 11, 1993); Final Affirmative Countervailing Duty Determination: Ferrosilicon From Venezuela; and Countervailing Duty Order for Certain Ferrosilicon From Venezuela, 58 Fed. Reg. 27,539 (May 10, 1993), amended by 58 Fed. Reg. 36,394 (July 7, 1993); Antidumping Duty Orders: Ferrosilicon From Venezuela and the Russian Federation, 58 Fed. Reg. 34,243 (June 24, 1993); Antidumping Duty Orders: Ferrosilicon From Kazakhstan and Ukraine, 58 Fed. Reg. 18,079 (Apr. 7, 1993), amended by 60 Fed. Reg. 64,018 (Dec. 13, 1995); Antidumping Duty Order: Ferrosilicon From Brazil, 59 Fed. Reg. 11,769 (Mar. 14, 1994).

The imposition of these orders remained unchallenged until 1998, when certain Brazilian ferrosilicon producers petitioned the ITC to institute a review of the Final Determination relating to ferrosilicon from that country. The petition alleged that a, then, recently disclosed price-fixing conspiracy among some domestic manufacturers, and its consequent distortion of the price data

presented to the ITC during its original material injury investigations, constituted "changed circumstances" sufficient to warrant review pursuant to 19 U.S.C. § 1675(b). See Ferrosilicon From Brazil, China, Kazakstan [sic], Russia, Ukraine, and Venezuela, 63 Fed. Reg. 27,747 (May 20, 1998). On July 28, 1998, the ITC instituted the requested changed circumstances review and, further, self-initiated changed circumstances reviews of the other related final affirmative material injury determinations—i.e., those pertaining to ferrosilicon from China, Kazakhstan, Russia, Ukraine, and Venezuela. See Ferrosilicon From Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, 63 Fed. Reg. 40,314 (July 28, 1998).

In May 1999, the ITC suspended these changed circumstances reviews and gave notice of its intention to "reconsider" its Final Determination. See Ferrosilicon From Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, 64 Fed. Reg. 28,212 (May 25, 1999) ("Notice"); see also USITC Pub. 3218, at 6 (Aug. 1999) (stating that "reconsideration was a more appropriate procedure for review of the original determinations"). The Notice stated:

> The [ITC] . . . has suspended the [changed circumstances reviews] and is instituting proceedings in which it will reconsider its [Final Determination].
>
> For further information concerning the conduct of this reconsideration and rules of general application, consult the Commission's Rules of Practice and Procedure, part 201, subparts A through E (19 CFR part 201), and part 207, subparts A, C, and D (19 CFR part 207).

Notice, 64 Fed. Reg. at 28,212.

Further, the <u>Notice</u> alerted interested parties that the record from the changed circumstances reviews would "be incorporated into the record of the[] reconsideration proceedings" ("Reconsideration Proceedings").  In addition, the <u>Notice</u> stated:

> Each Party can submit comments, including new factual information . . . limited to the issues of (a) the price-fixing conspiracy, or other anticompetitive conduct relating to the original periods of investigation, and (b) any possible material misrepresentations or material omissions, by any entity that provided information or argument in the original investigations, concerning: (1) the conspiracy or other anticompetitive conduct or (2) any other matter.

See <u>Notice</u>, 64 Fed. Reg. at 28,213.

Thereafter, the ITC reversed and vacated its Final Determination, and issued a negative injury determination as to the original investigations.  <u>See</u> <u>Ferrosilicon From Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela</u>, 64 Fed. Reg. 47,865 (Sept. 1, 1999) ("Reconsideration Determination"); <u>see generally</u> USITC Pub. 3218, at 1.  As part of this Reconsideration Determination, the ITC concluded that it need not examine whether the alleged price-fixing conspiracy actually distorted the domestic ferrosilicon prices at issue in the original investigations.  <u>See</u> USITC Pub. 3218, at 23–24 ("[The ITC] cannot conclude what, if any, of the representations made by the domestic producers on pricing and market conditions are sufficiently credible to rely on.  Consequently, in our reconsideration determinations we have taken adverse inferences against these firms and used the facts otherwise available, as authorized by the statute and case law.").[2]  As a result, the ITC concluded that, during the period under review in the

---

[2]        On this point, the ITC stated:

                                                                                          (continued...)

original investigations, the domestic ferrosilicon industry "in the United States [was] neither

materially injured nor threatened with material injury by reason of imports of ferrosilicon from

Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela that have been found by . . .

Commerce to be sold at less than fair value and imports of ferrosilicon that . . . Commerce has

found [were] subsidized by the Government of Venezuela." See Ferrosilicon From Brazil,

Kazakhstan, People's Republic of China, Russia, Ukraine, and Venezuela, 64 Fed. Reg. 51,097,

51,098 (Sept. 21, 1999); see also USITC Pub. 3218, at 4.

In accordance with the ITC's Reconsideration Determination, Commerce "rescinded" the

antidumping and countervailing duty orders covering the subject imports. See Ferrosilicon From

Brazil, Kazakhstan, People's Republic of China, Russia, Ukraine, and Venezuela, 64 Fed. Reg. at

---

[2](...continued)

> The discussion [here] demonstrates that . . . each [party] withheld
> or misrepresented essential information directly relevant to the
> Commission's statutory mandate: whether the domestic industry is
> materially injured by reason of subject imports. By such conduct,
> these producers significantly impeded, undermined, and
> compromised the integrity of the Commission's investigations.

> The Commission's governing statute provides that "whenever a
> party . . . refuses or is unable to produce information requested in a
> timely manner and in the form required, or otherwise significantly
> impedes an investigation, [the Commission shall] use the best
> information otherwise available." This provision enables the
> Commission . . . to avoid "rewarding the uncooperative and
> recalcitrant party for its failure to supply requested information . . .
> ."

See USITC Pub. 3218, at 21 (footnotes omitted).

51,098. In conjunction with this rescission, Commerce terminated all related administrative reviews, see id., and instructed the United States Customs Service to liquidate all unliquidated entries.[3] See id. at 51,099.

Subsequently, Plaintiffs brought separate suits challenging the actions of the ITC, and these suits were consolidated. This consolidated action is currently before the court,[4] and in it Plaintiffs raise both procedural and substantive issues. At this time, however, the court need only address two procedural issues: (1) whether the ITC had the authority to reconsider its Final Determination; and (2) if the ITC possessed such authority, whether the Reconsideration Proceedings were improperly conducted because, among other reasons, the ITC failed to hold a hearing as provided for in the procedures that it published as those that would govern the Reconsideration Proceedings.

The ITC and defendant-intervenors Ferroatlantica de Venezuela ("Ferroven"), General Motors Corporation ("GM"), Associação Brasileira dos Productores de Ferroligas e de Silico Metalico, Companhia Brasileira Carbureto de Calcio-CBCC, Companhia de Ferroligas de Bahia-FERBASA, Nova Era Silicon S/A, Italmagnesio S/A-Industria e Comercio, Rima Industrial S/A, and Companhia Ferroligas Minas Gerais-Minasligas; and Ronly Holdings, Ltd., Cheliubinski

---

[3]     Excepted from these instructions were all entries of ferrosilicon from Venezuela, which were, and remain, the subject of a previously granted preliminary injunction. See AIMCOR v. United States, 23 CIT __, 83 F. Supp. 2d 1293 (1999).

[4]     The separate suits against Commerce were also consolidated under Consol. Court No. 99-10-00660. This action is stayed pending resolution of the merits of the case at bar.

Electrometalurgical Works, Kuznetsk Ferroalloy Works, Stakhanov Ferroalloy Works, and

Zaporozhye Ferroalloy Works (collectively "Defendants") argue that:  (1) the ITC had the

inherent authority to reconsider its Final Determination; and (2) the Reconsideration Proceedings

were properly conducted, in that the ITC was not required to conduct a hearing because Plaintiffs

did not request one.

**STANDARD OF REVIEW**

The court, when reviewing final determinations made pursuant to 19 U.S.C. §

1516a(a)(2)(B)(ii), will hold unlawful those agency determinations, findings or conclusions that

are unsupported by substantial evidence on the record, or otherwise not in accordance with law.

19 U.S.C. § 1516a(b)(1)(B)(i); see Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)

("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent

an administrative agency's finding from being supported by substantial evidence." (citations

omitted)); Inland Steel Indus., Inc. v. United States, 188 F.3d 1349, 1359 (Fed. Cir. 1999);

Hoogovens Staal, BV v. United States, 24 CIT __, __, 86 F. Supp. 2d 1317, 1323 (2000) ("[I]n

reviewing agency determinations the court declines to reweigh or reinterpret the evidence of

record." (citation omitted)); see also Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)

("Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." (citations omitted)).

**DISCUSSION**

## I.        Authority to Reconsider

In considering the issue of the ITC's power to reconsider the Final Determination, two questions need to be examined:  first, does the ITC have the authority to reconsider a final determination; and second, in the event that it possesses such authority, does it extend to a reconsideration taken approximately four and one-half years after such final determination was rendered?

As to the first question, Plaintiffs claim that the ITC did not have the authority to reconsider the Final Determination, because the ITC is "'entirely a creature of statute [and] [a]ny authority delegated or granted to [it] . . . is necessarily limited to the terms of the delegating statute.'"  (CCMA's Mem. Supp. Mot. J. Agency R. at 8–9 (alteration in original) (quoting Sealed Air Corp. v. United States Int'l Trade Comm'n, 645 F.2d 976, 993 (C.C.P.A. 1981).)  This being the case Plaintiffs argue, since "Congress[] fail[ed] to grant the ITC reconsideration authority in antidumping investigations . . . affirmative injury determinations in antidumping proceedings cannot be reconsidered by the ITC . . . ." (Id. at 9.)

Defendants, on the other hand, argue that administrative agencies in general, and the ITC in particular, have the inherent authority to institute reconsideration proceedings so as "to vindicate the integrity of the administrative process."  (ITC's Mem. Opp'n to Mot. J. Agency R. at 13.)  In addition, Defendants argue that the antidumping statute does not "preclude reconsiderations under appropriate circumstances."  (Ferroven's Mem. Opp'n to Mot. J. Agency

R. at 13 (citation omitted).)

The court agrees with Defendants. It is indeed the general rule that federal agencies have the power to reconsider their final determinations. Trujillo v. Gen. Elec. Co., 621 F.2d 1084, 1086 (10th Cir. 1980) ("Administrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider." (citation omitted)); Prieto v. United States, 655 F. Supp. 1187, 1191 (D.D.C. 1987) ("There can be no dispute that administrative agencies have inherent power to reconsider their own decisions . . . ." (citations omitted)); accord Bookman v. United States, 453 F.2d 1263, 1265 (Ct. Cl. 1972) ("[I]t may be imperative for [agencies] to consider new developments or newly discovered evidence in order to facilitate the orderly and just resolution of conflict. . . . [Therefore,] '[e]very tribunal, judicial or administrative, has [the] power to correct its own errors or otherwise appropriately to modify its judgment[s] . . . .'" (citation omitted)).

Plaintiffs contend, however, that this inherent authority to reconsider final decisions is limited to adjudicative rather than investigatory agencies (CCMA's Mem. Supp. Mot. J. Agency R. at 10) and that because the ITC's "proceedings are not 'adjudicative[]'" it, therefore, "has no 'equitable' powers when acting in its investigative capacity." Id. Indeed, in Grupo Indus. Camesa v. United States, 18 CIT 461, 463, 853 F. Supp. 440, 443 (1994), aff'd, 85 F.3d 1577 (Fed. Cir. 1996), this court held, inter alia, that Congress intended the ITC's "hearing[s] to be non-adjudicative in nature." However, while the ITC is usually characterized as an investigatory rather than an adjudicative agency, this court in later decisions has found that the ITC renders its

final determinations in a quasi-adjudicative manner. See Fujian Mach. & Equip. & Exp. Corp. v. United States, 25 CIT __, __, Slip Op. 01-120, at 10 (Sept. 28, 2001) ("The proceedings in an antidumping investigation or administrative review constitute a very strange creature in the taxonomy of modern American administrative law. [Although] Congress has stated that such proceedings are 'investigatory' rather than adjudicatory . . . the Court of International Trade . . . has observed that in substance they are quasi-adjudicatory." (citation omitted)).[5] In fact, courts have explicitly found the ITC to have the authority to reconsider its final determinations. See Borlem S.A. – Empreedimentos Industriais v. United States, 913 F.2d 933, 938–39 (Fed. Cir. 1990) (finding Court of International Trade has the authority to order ITC, on remand, to reconsider a prior determination where such decision was based on erroneous data); see also Alberta Gas Chems., Ltd. v. Celanese Corp., 650 F.2d 9, 12–14 (2d Cir. 1981) ("This universally accepted rule [that Federal Courts possess the authority to reconsider their final decisions] has been applied to proceedings before federal administrative agencies. . . . We find no reason, therefore, not to give the [ITC] the opportunity to resolve in the first instance the major issues in this litigation." (citation omitted)). A finding that the ITC has the authority to reconsider a final determination is particularly appropriate where after-discovered fraud is alleged.[6] See Alberta

---

[5]       Compare Pesquera Mares Australes Ltda. v. United States, 266 F.2d 1372 (Fed. Cir. 2001) ("In short, Commerce's antidumping determinations are 'adjudication[s] that produce . . . rulings for which deference [under Chevron] is claimed.'" (citation omitted)); but see Nippon Steel Corp. v. United States, Slip Op. 01-154, at 6 n.4 (Dec. 31, 2001) (finding antidumping proceedings investigative because their "basic core findings must be made without regard to the claims of the parties, ex parte factual submissions are permitted, there is no administrative law judge, and there is no formal record prior to the final determination." (emphasis in original)).

[6]       The court in Alberta Gas Chems., Ltd. relied on Hazel-Atlas Glass Co. v. Harford-Empire Co., 322 U.S. 238, 244 (1944), where the Supreme Court stated, in discussing the

                                                                                                    (continued...)

Gas Chems., Ltd., 650 F.2d at 13 ("It is hard to imagine a clearer case for [the ITC] exercising this inherent power than when a fraud has been perpetrated on the tribunal in its initial proceeding.").

Here, the Final Determination was predicated on, what the ITC later described as, "serious material misrepresentations and omissions [Plaintiffs] made during the original investigations on the key issue of ferrosilicon pricing." (ITC's Mem. Opp'n to Mot. J. Agency R. at 5.) According to the ITC's brief, during the changed circumstances reviews, it learned "that individuals from the domestic ferrosilicon industry who provided information . . . in [the] original investigations were either involved in or personally aware of the price-fixing conspiracy" that overlapped a substantial portion of the original investigation period. (Id.) Since "[t]hese [individuals] testified and submitted information . . . asserting that the ferrosilicon market was driven by intense price competition" (id.) it seems, therefore, to "make[] good sense," see Alberta Gas Chems., Ltd., 650 F.2d at 12, that the ITC examine whether the data relied on in making its Final Determination was either false or misleading. Thus, the court finds that the ITC possessed

---

[6](...continued)

inherent power of federal courts to reconsider their final judgments, "there has existed . . . a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments regardless of the term of their entry." Although Hazel dealt with a federal court's inherent authority to reconsider final judgments Alberta Gas Chems., Ltd., extended this reasoning to cover federal agencies. Alberta Gas Chems., Ltd., 650 F.2d at 12–13 ("This universally accepted rule has been applied to federal agencies. . . . Under these circumstances, it makes good sense to allow the [ITC] to determine initially whether there was perjury and if there was, whether the perjury affected the result before the [ITC].").

the authority to reconsider the Final Determination.[7]

Having determined that the ITC had the power to reconsider its Final Determination, the court addresses the question of whether too much time passed from the issuance of the Final Determination to the date the ITC initiated its Reconsideration Proceedings. Plaintiffs argue that the "ITC did not [conduct its Reconsideration Proceedings] within a reasonable time after it knew or should have known of the [price-fixing conspiracy] convictions." (CCMA's Mem. Supp. Mot. J. Agency R. at 16.) The ITC, however, argues that it "initiated [the Reconsideration] [P]roceedings promptly after information about the misrepresentations and omissions in the original investigation was presented to it . . . ." (ITC's Mem. Opp'n to Mot. J. Agency R. at 16.)

The question presented to the court, then, is whether the four and one-half year period of time that elapsed between the Final Determination and commencement of the Reconsideration Proceedings was reasonable. See Belville Mining Co. v. United States, 999 F.2d 989, 997 (6th Cir. 1993) ("Even where there is no express reconsideration authority for an agency, however, the general rule is that an agency has inherent authority to reconsider its decision, provided that reconsideration occurs within a reasonable time after the first decision." (citations omitted)). Under the facts presented here, the court finds that the Reconsideration Proceedings were held within a reasonable time. In accordance with its statutes and its regulations, the ITC does not monitor subsequent developments as they pertain to a particular final determination. After

---

[7]     In finding that the ITC had the authority to reconsider the Final Determination, the court need not, and does not, make any findings with respect to the allegations of material misrepresentations or omissions themselves.

rendering a final affirmative determination, the ITC publishes its findings in the Federal Register

and communicates them to Commerce, which then issues an appropriate order.  The ITC,

therefore, was under no obligation to monitor the domestic ferrosilicon industry subsequent to

rendering its Final Determination; nor is it reasonable to expect that the ITC should have done so

of its own accord.  The statutory scheme governing an antidumping or countervailing duty final

affirmative determination provides, however, for various kinds of reviews—e.g., changed

circumstances reviews and five-year reviews—that allow interested parties to bring relevant

developments to the ITC's attention.  Thus, allegations of fraud, of the kind made here, would

necessarily come to the ITC's attention, if at all, at a time somewhat remote from the original

investigations.  Indeed, in this case, the evidence of the purported fraud came to light during the

course of changed circumstances reviews.  See Ferrosilicon From Brazil, China, Kazakhstan,

Russia, Ukraine, and Venezuela, 63 Fed. Reg. at 40,314.  Thereafter, the ITC acted promptly, by

suspending the changed circumstances reviews, and initiating the Reconsideration Proceedings.

See Notice, 64 Fed. Reg. at 21,812.  On this point the ITC has stated:

> During the changed circumstances review, the Commission
> received extensive information and argument regarding the price-
> fixing conspiracy and its implications for the Commission's
> determinations.  After considering the information and argument,
> the Commission determined that reconsideration was a more
> appropriate procedure for review of the original determinations. . . .
> Thus, on May 21, 1999, the Commission suspended the changed
> circumstances review and instituted a reconsideration of the
> original determinations.

USITC Pub. 3218, at 5–6 (footnote omitted).  Thus, the ITC took action soon after it possessed

information it believed substantiated the allegations concerning the price-fixing conspiracy.

Therefore, even though the period of time that elapsed between the Final Determination and the

commencement of the Reconsideration Proceedings was substantial, it was not unreasonable.

## II.     Adherence to Procedures

In their briefs, Plaintiffs contend that, in deciding whether they were entitled to a hearing during the course of the Reconsideration Proceedings, the court must address the issue of whether the ITC violated their constitutional due process rights.  In support of their contention, Plaintiffs argue that due process required that they be granted an evidentiary hearing because "an opportunity to be heard was central to the fact-finding process."  (Globe's Mem. Supp. Mot. J. Agency R. at 23.)  And, that "[i]n taking the 'extraordinary step' of . . . instituting a reconsideration proceeding . . . the ITC should have recognized that its inquiry had changed from the conventional economic investigative ambit to [a] historical fact-finding [procedure.]"  (Id. at 24.)  Defendants, for their part, contend that Plaintiffs' constitutionally protected interests were not violated in the Reconsideration Proceedings, because "[a] prerequisite for due process protection is [that Plaintiffs have] some interest worthy of protect[ion]."  (GM's Mem. Opp'n to Mot. J. Agency R. at 23 (citation omitted).)

While both Plaintiffs and the ITC couch their arguments, at least in part, in constitutional terms, the issue of whether Plaintiffs' constitutional due process rights were violated need not be addressed to decide the questions presented.  See Transcom, Inc. v. United States, 182 F.3d 876, 879–80 (Fed. Cir. 1999) ("[W]e need not address [Plaintiff]'s argument that the . . . administrative reviews violated [Plaintiff]'s rights under the due process clause of the Fifth Amendment to the Constitution, because we hold that Commerce's conduct in this case violated

Commerce's statutory and regulatory notice obligations in connection with the administrative reviews." (citation omitted)); see also NEC Corp. v. United States, 21 CIT 933, 946, 978 F. Supp. 314, 326–27 (1997) (quoting Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 321 (1933)). The court, therefore, need not consider the proposed constitutional issues if the matters in question can be settled by reference to statute. Transcom, Inc., 182 F.3d at 879–80. To reach this determination, however, the court must examine whether Plaintiffs were afforded a proceeding conducted in accordance with: (1) the provisions of the Notice; and (2) the ITC's governing law, and the regulations promulgated thereunder. NEC Corp., 21 CIT at 946, 978 F. Supp. at 326–27.

As to Plaintiffs' argument that the Reconsideration Proceedings were improperly conducted because they were not afforded a hearing, Defendants argue that Plaintiffs "did not request . . . any additional hearing during [the R]econsideration [P]roceeding[s]" and, therefore, it was not required to conduct one. (ITC's Mem. Opp'n to Mot. J. Agency R. at 5, 29.) In support of its argument, the ITC relies on subsection 1677c of title 19, which states: "[T]he . . . Commission shall . . . hold a hearing in the course of an investigation upon the request of any party to the investigation before making a final determination under section 1671d or 1673d of this title." 19 U.S.C. § 1677c(a)(1) (1988) (emphasis added). The statute cited by Defendants, however, does not end the matter. The ITC was bound to conduct the Reconsideration Proceedings not only in accordance with its statutes, but also in accordance with the regulations referred to in the Notice. That the ITC was required to give notice to interested parties regarding how the Reconsideration Proceedings would be conducted is well settled. See, e.g., Am. Lamb

Co. v. United States, 785 F.2d 994 (Fed. Cir. 1986). It is equally well settled that once it gave notice as to how the Reconsideration Proceedings would be conducted, the ITC was required to actually conduct those proceedings in accordance therewith. See PPG Indus., Inc. v. United States, 13 CIT 183, 190 n.4, 708 F. Supp. 1327, 1332 n.4 (1989) ("[A]n agency's failure to follow its own rules and procedures is fatal to action." (citation omitted)). In addition, the ITC was obligated to notify interested parties of any change in the manner in which these proceedings would be conducted. See Gen. Elec. Co. v. United States, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner . . . ." (citation omitted)).

Here, while the ITC styled its proceedings as a reconsideration, it had no statutory or regulatory guidance as to how the proceedings were to be conducted.[8] (Oral Arg. Tr. 9/05/01, at 119.) Under these circumstances, it was not unreasonable for the ITC to rely on existing regulations and, thus, it notified interested parties to look to "the Commission's Rules of Practice and Procedure, part 201, subparts A through E (19 CFR part 201), and part 207, subparts, A, C, and D (19 CFR part 207)." Notice, 64 Fed. Reg. at 28,212. By doing so, the ITC informed

---

[8]    See Ferrosilicon from Brazil, Kazakhstan, People's Republic of China, Russia, Ukraine, and Venezuela, 64 Fed. Reg. at 51,098 ("The ITC's action in these cases is unique and there is no statutory provision which explicitly provides for the manner in which the Department should rescind these orders. . . . In this instance, therefore, rescission of the[se] ferrosilicon orders from the dates of issuance is the legal equivalent of the action required to be taken by the Department under sections 705(c)(2) and 735(c)(2).").

interested parties that were entitled to rely on the provisions of subsection 207.23(a), which state, in relevant part, "[t]he Commission shall hold a hearing concerning an investigation before making a final determination . . . ." 19 C.F.R. § 207.23 (1993). Thus, the ITC gave notice "with ascertainable certainty," Gen. Elec. Co., 53 F.3d at 1329, that there would be a hearing prior to a final determination being rendered, thereby creating an obligation on its part to provide such hearing. See Mercer v. Dep't of Health and Human Servs., 772 F.2d 856, 859 (Fed. Cir. 1985) ("Where the agency has adopted a procedure that provides for a predecision hearing the denial of [this] predecision hearing is clear error.").

Rather than doing so, however, the ITC concluded no new hearings would be held. Instead, the ITC included in the record a January 22, 1993 hearing conducted in connection with the original investigation leading to its Final Determination, see USITC Pub. 2606, App. B, and, further, incorporated into the record a second hearing conducted on April 13, 1999, during the changed circumstances reviews. (ITC's Mem. Opp'n to Mot. J. Agency R. at 28.) Each hearing was held before the ITC gave notice that it had suspended the changed circumstances reviews and instituted the Reconsideration Proceedings.[9] These hearings, however, were not sufficient to fulfill the ITC's commitments. Although the ITC may not have been required by statute to grant a hearing during the course of the Reconsideration Proceedings, by directing interested parties to the regulations cited in the Notice it created an obligation to do so. See Mercer, 772 F.2d at 859.

---

[9] This is particularly significant as to Globe for, although Globe was party to the proceedings leading to the Final Determination, it did not participate in the changed circumstances reviews. Notice, 64 Fed. Reg. at 28,212; (see also ITC's Mem. Opp'n to Mot. J. Agency R. at 27.)

In addition, by citing these regulations in the Notice, the ITC obliged itself to conduct the Reconsideration Proceedings in every particular in accordance with those regulations. Thus, Plaintiffs were entitled not only to a hearing, they were also entitled to all of the other benefits of the "Commission's Rules of Practice and Procedure, part 201, subparts A through E (19 CFR part 201), and part 207, subparts, A, C, and D (19 CFR part 207)[]" Notice, 64 Fed. Reg. at 28,212, including adequate notice, pre-hearing briefing and post-hearing briefing. See 19 C.F.R. § 207.20(b) ("Upon receipt of notice from the administrating authority of an affirmative preliminary determination [or] notice of an affirmative final determination . . . the Commission shall publish in the Federal Register notice of its investigation to reach a final determination . . . ."); 19 C.F.R. § 207.22 ("Each party may submit to the Commission, no later than a date specified in the notice of investigation, a prehearing brief."); 19 C.F.R. § 207.23(a) ("The Commission shall hold a hearing concerning an investigation before making a final determination . . . ."); 19 C.F.R. § 207.24 ("Any party may file a posthearing brief concerning the information adduced at or after the hearing with the Secretary within a time specified in the notice of investigation or by the presiding official at the hearing.").

Finally, as to the ITC's contention that it need not examine whether the alleged price-fixing conspiracy actually distorted the domestic ferrosilicon prices at issue in the original investigations, should evidence with respect thereto be presented during the course of the further proceedings on remand, the ITC shall consider such evidence as it would consider any other evidence on the record. See 19 U.S.C. § 1677e (1988).

## CONCLUSION

For the reasons set forth above, the court finds that, while the ITC had the authority to reconsider its Final Determination, it failed to adhere to the procedures that it published as those that would govern its Reconsideration Proceedings.  The Reconsideration Proceedings were, thus, conducted in a manner not in accordance with law and, therefore, the Reconsideration Determination is remanded to the ITC for further action consistent with this opinion.  The parties shall consult, and  propose an order governing timing of the remand proceedings no later than March 4, 2002.

_____

Richard K. Eaton, Judge

Dated:  February 21, 2002
          New York, New York

**ERRATUM**


<u>Elkem Metals Co., et al. v. United States, et al.</u>, Consol. Court No. 99-10-00628, Slip-Op 02-18, dated February 21, 2002.


Page 2:        Counsel for Plaintiff Elkem should read as follows:

        *Verner, Liipfert, Bernhard, McPherson and Hand* (*William D. Kramer*); *Eckert Seamans Cherin & Mellott, LLC* (*Dale Hershey* and *Mary K. Austin*); *Howrey, Simon, Arnold & White* (*John W. Nields, Jr.* and *Laura W. Shores*) for Plaintiff Elkem Metals Company.


April 1, 2002.