SLIP OP. 03-66

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

| | |
|---|---|
| ELKEM METALS CO., AMERICAN ALLOYS, INC., APPLIED INDUSTRIAL MATERIALS CORP., AND CC METALS & ALLOYS, INC., : <br><br> PLAINTIFFS, : <br><br> AND : <br><br> GLOBE METALLURGICAL, INC., : <br><br> PLAINTIFF-INTERVENOR, : <br><br> V. : <br><br> UNITED STATES OF AMERICA, : <br><br> DEFENDANT, : <br><br> AND : <br><br> FERROATLANTICA DE VENEZUELA, GENERAL MOTORS CORP., ASSOCIAÇÃO BRASILEIRA DOS PRODUCTORES DE FERROLIGAS E DE SILICO METALICO, ET AL., AND RONLY HOLDINGS, LTD., ET AL., : <br><br> DEFENDANT-INTERVENORS. : | CONSOL. COURT NO. 99-10-00628 |

[United States International Trade Commission's determination on reconsideration, as modified by first remand determination, remanded for further proceedings in accordance with this opinion.]

Dated: June 18, 2003

*Piper Rudnick, LLP* (*William D. Kramer, Martin Schaefermeier*), *Eckert Seamans Cherin & Mellott, LLC* (*Dale Hershey, Mary K. Austin*), and *Howrey Simon Arnold & White, LLP* (*John W. Nields, Jr., Laura S. Shores*) for Plaintiff Elkem Metals Company.

    *Altheimer & Gray* (*Theodore J. Low*) for Plaintiff Applied Industrial Materials Corporation.

    *Arent Fox Kintner Plotkin & Kahn, PLLC* (*George R. Kucik*, *Eugene J. Meigher*, *Stephen L. Gibson*, *Kate B. Briscoe*), and *Thelen Reid & Priest, LLP* (*Gerald Zingone*) for Plaintiff CC Metals & Alloys, Inc.

    *Dangel & Mattchen, LLP* (*Edward T. Dangel, III*, *Michael K. Mattchen*) for Plaintiff-Intervenor Globe Metallurgical, Inc.

    *Lyn M. Schlitt*, General Counsel, United States International Trade Commission, *James M. Lyons*, Deputy General Counsel, United States International Trade Commission (*Marc A. Bernstein*) for Defendant.

    *Kaye Scholer Fierman Hays & Handler, LLP* (*Julie C. Mendoza*, *Donald B. Cameron*, *R. Will Planert*, *Margaret Scicluna Rudin*) for Defendant-Intervenor Ferroatlantica de Venezuela.

    *Hogan & Hartson, LLP* (*Mark S. McConnell*) for Defendant-Intervenor General Motors Corporation.

    *Dorsey & Whitney, LLP* (*Philippe M. Bruno*, *Kevin B. Bedell*) for Defendant-Intervenors Associação Brasileira dos Productores de Ferroligas e de Silicio Metalico, Companhia Brasileira Carbureto de Calcio-CBCC, Companhia de Ferroligas de Bahia-FERBASA; Nova Era Silicon S/A, Italmagnesio S/A-Industria e Comercio, Rima Industrial S/A, and Companhia Ferroligas Minas Gerais-Minasligas.

    *Aitken Irvin Berlin & Vrooman, LLP* (*Bruce Aitken*, *Virginie Lecaillon*) for Defendant-Intervenors Ronly Holdings, Ltd., Cheliubinski Electrometalurgical Works, Kuznetsk Ferroalloy Works, Stakhanov Ferroalloy Works, and Zaporozhye Ferroalloy Works.

OPINION AND ORDER

*EATON*, *Judge*: Before the court are the motions of plaintiffs Elkem Metals Company ("Elkem"),

American Alloys, Inc. ("American Alloys"),[1] Applied Industrial Materials Corporation

---

[1]     American Alloys did not participate in the remand proceedings as it was in liquidation. *See* Views of the Commission, Ferrosilicon From Braz., China, Kaz., Russ., Ukr., Ven., Invs. Nos. 303-TA-23, 731-TA-566–570, and 731-TA-641 (Final) (Reconsideration)

(continued...)

("AIMCOR"), and CC Metals & Alloys, Inc. ("CCMA"), and plaintiff-intervenor Globe

Metallurgical, Inc. ("Globe") (collectively, "Plaintiffs"), for judgment upon the agency record

pursuant to USCIT R. 56.2. Plaintiffs challenge the United States International Trade

Commission's ("ITC") negative injury determination in *Ferrosilicon From Braz., China, Kaz.,*

*Russ., Ukr., Ven.,* 64 Fed. Reg. 47,865 (ITC Sept. 1, 1999) (reconsideration determination). *See*

Views of the Commission, *Ferrosilicon From Braz., China, Kaz., Russ., Ukr., Ven.,* Invs. Nos.

303-TA-23, 731-TA-566–570, and 731-TA-641 (Reconsideration), USITC Pub. 3218 (Aug.

1999), Pub. R. List 1, Doc. 558AR ("Reconsideration Determination"). In *Elkem Metals Co. v.*

*United States*, 26 CIT __, 193 F. Supp. 2d 1314 (2002) ("*Elkem IV*"), familiarity with which is

presumed, this court remanded the Reconsideration Determination with respect to certain

procedural issues.[2] The ITC's Reconsideration Determination, as modified on remand, is the

subject of this action. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. §

1516a(a)(2)(B)(ii) (2000). For the reasons set forth below, the court remands this matter for

further proceedings in accordance with this opinion.

---

[1](...continued)
(Remand), USITC Pub. 3531 (Sept. 2002), Pub. R. List 1, Doc. 606R ("Remand Determination")
at 4 n.15.

[2]         Prior to *Elkem IV*, this court issued three opinions that addressed various
procedural matters. *See Elkem Metals Co. v. United States*, 24 CIT 255 (2000) (ordering the ITC
to submit certified copies of certain documents to the court for *in camera* review); *Elkem Metals
Co. v. United States*, 24 CIT 1395, 126 F. Supp. 2d 567 (2000) (granting in part and denying in
part Plaintiffs' motion to compel production of certain sealed items in the record); *Elkem Metals
Co. v. United States*, 25 CIT __, 135 F. Supp. 2d 1324 (2001) (denying Plaintiffs' motion for
preliminary injunction).

BACKGROUND

In response to petitions filed on behalf of the domestic ferrosilicon industry in 1992 and 1993, the ITC instituted investigations of ferrosilicon from Brazil, Kazakhstan, the People's Republic of China ("China"), Russia, Ukraine, and Venezuela ("Subject Countries"). *See* Reconsideration Determination at 12. The ITC selected the years 1989 through 1993 as the period of investigation ("Original POI").[3] *See id*. During its investigations, the ITC collected data for those years by various means, including by issuance of questionnaires.

Between late 1989 and mid-1991 ("Conspiracy Period"), a conspiracy to fix prices of commodity ferrosilicon existed among three domestic ferrosilicon producers: (1) Elkem, (2) American Alloys, and (3) SKW Metals & Alloys, Inc. ("SKW")[4] (collectively, "Conspirators"). Reconsideration Determination at 10. The price-fixing conspiracy, however, was not brought to the ITC's attention during the Original POI. *Id*. at 11–12. Therefore, in 1993 and 1994, the ITC issued final affirmative injury determinations with respect to the Subject Countries. *See* Ferrosilicon From the P.R.C., 58 Fed. Reg. 13,503 (ITC Mar. 11, 1993) (final determination); Ferrosilicon From Kaz. and Ukr., 58 Fed. Reg. 16,847 (ITC Mar. 31, 1993) (final determination); Ferrosilicon From Russ. and Ven., 58 Fed. Reg. 34,064 (ITC June 23, 1993) (final determination); Ferrosilicon From Braz., 59 Fed. Reg. 10,165 (ITC Mar. 3, 1994) (final

---

[3]        This court has held that the ITC may, in its discretion, determine the period of investigation for its material injury analysis. *See Metallverken Nederland B.V. v. United States*, 13 CIT 1013, 1018, 728 F. Supp. 730, 735 (1989) ("The Commission has discretion to determine the appropriate periods of investigation.") (citations omitted). No dispute exists with respect to the duration of the Original POI or the propriety of the years selected.

[4]        SKW is the predecessor firm of CCMA. *See* Remand Determination at 5.

determination). In 1995, Elkem and American Alloys pled guilty to charges that they had conspired to fix prices of commodity ferrosilicon in violation of the Sherman Act, 15 U.S.C. § 1 (1990). *See* Pub. R. List 1, Doc. 325, Ex. 6 & 7 (plea agreements of Elkem and American Alloys). In 1997, a jury convicted SKW and a corporate officer of SKW, Mr. Charles Zak, of criminal charges related to the conspiracy. *See United States v. SKW Metals & Alloys, Inc.*, 4 F. Supp. 2d 166 (W.D.N.Y. 1997), *aff'd*, *remanded on other grounds*, 195 F.3d 83 (2d Cir. 1999).

The ITC learned of the conspiracy only in 1998 when the Brazilian respondents in the original investigation petitioned the ITC for a changed circumstances review of the final affirmative injury determination relating to ferrosilicon from Brazil. *See* Ferrosilicon From Braz., China, Kaz., Russ., Ukr., and Ven., 63 Fed. Reg. 27,747 (ITC May 20, 1998) (request for comments regarding institution of changed circumstances revs.). On July 28, 1998, the ITC instituted the requested changed circumstances review and, further, self-initiated changed circumstances reviews of the other related final affirmative material injury determinations— i.e., those pertaining to China, Kazakhstan, Russia, Ukraine, and Venezuela. *See* Ferrosilicon From Braz., China, Kaz., Russ., Ukr., Ven., 63 Fed. Reg. 40,314 (ITC July 28, 1998) (notice of institution of changed circumstances revs.). After receiving comments with respect to issues concerning the conspiracy, the ITC suspended these changed circumstances reviews and gave notice of its intention to initiate reconsideration proceedings. *See* Ferrosilicon From Braz., China, Kaz., Russ., Ukr., Ven., 64 Fed. Reg. 28,212 (ITC May 25, 1999) (notice of suspension of changed circumstances revs. and institution of reconsideration proceedings) ("Notice"). Subsequently, the ITC reversed and vacated its original affirmative injury determinations and

issued a negative injury determination with respect to the original investigations.

Reconsideration Determination at 1.

Thereafter, Plaintiffs brought this consolidated action alleging, among other things, that

the ITC lacked the authority to conduct a reconsideration. In *Elkem IV*, this court held that, while

the ITC was within its authority to reconsider its original final determinations, "it failed to adhere

to the procedures that it published [in the Notice] as those that would govern its Reconsideration

Proceedings," and, thus, that the reconsideration proceedings were not in accordance with law.

*Elkem IV*, 26 CIT at __, 193 F. Supp. 2d at 1325. Accordingly, the court remanded the matter

and ordered the ITC to conduct a hearing in conformity with the regulations referenced in the

Notice, and afford the parties "all of the other benefits of the 'Commission's Rules of Practice

and Procedure, part 201, subparts A through E (19 CFR part 201), and part 207, subparts, A, C,

and D (19 CFR part 207)[]' Notice, 64 Fed. Reg. at 28,212, including adequate notice, pre-

hearing briefing and post-hearing briefing." *Id*. (citing 19 C.F.R. §§ 207.20(b), 207.22,

207.23(a), 207.24 (1999)). The court further ordered:

> Finally, as to the ITC's contention that it need not examine whether
> the alleged price-fixing conspiracy actually distorted the domestic
> ferrosilicon prices at issue in the original investigations, should
> evidence with respect thereto be presented during the course of the
> further proceedings on remand, the ITC shall consider such
> evidence as it would consider any other evidence on the record.

*Id*. (citing 19 U.S.C. § 1677e (1988)). By its Remand Determination, the ITC affirmed its

negative injury determination, which affirmance is now before the court.

STANDARD OF REVIEW

When reviewing a final determination in an antidumping or countervailing duty investigation, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Bethlehem Steel Corp. v. United States*, 26 CIT __, __, 223 F. Supp. 2d 1372, 1375 (2002) ("The same standard of review applies to the review of a remand determination as to the review of the original determination." (citations omitted)). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) (citations omitted).

In conducting its review of the ITC's factual findings, "[t]he Court's function is not to re-weigh the evidence but rather to ascertain whether there exists 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Chefline Corp. v. United States*, 26 CIT __, __, 219 F. Supp. 2d 1303, 1305 (2002) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may 'uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (bracketing in original) (internal quotation and citation omitted)). "[T]he possibility of drawing two inconsistent conclusions

from the evidence does not prevent an administrative agency's finding from being supported by

substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations

omitted).


DISCUSSION

As an initial matter, no party seriously disputes that the ITC complied with this court's

instructions in *Elkem IV* with respect to the procedures used in conducting its subsequent

proceedings.[5]  Plaintiffs do contend, however, that the negative determination reached by the ITC

on reconsideration, and affirmed on remand, is neither supported by substantial evidence nor in

accordance with law.

---

[5]        CCMA alleges that the remand proceedings were conducted in a manner that violated its procedural due process rights because of certain alleged defects in the notice provided in Ferrosilicon From Braz., China, Kaz., Russ., Ukr., Ven., 67 Fed. Reg. 18,633 (ITC Apr. 16, 2002) (notice of institution and scheduling of remand proceedings).  CCMA argues that the cases cited by this court in *Elkem IV* as authority for the ITC's power to reconsider its original determinations "all stand for the proposition that allegations of misconduct serious enough to warrant reconsideration are also serious enough to trigger constitutional due process protections for the parties charged with wrongdoing," which, CCMA alleges, include specific notice of the charges against it and an opportunity to cross-examine adverse witnesses.  *See* Pub. Comments of CCMA on ITC's Remand Determinations ("CCMA Comments") at 28.  CCMA cites, as an example, *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), which this court quoted in its discussion of *Alberta Gas Chemicals, Ltd. v. Celanese Corp.*, 650 F.2d 9 (2d Cir. 1981), a case relied upon as support for the proposition that federal agencies have the authority to reconsider their final determinations.  *Elkem IV*, 26 CIT at __, 193 F. Supp. 2d at 1321 n.6.  CCMA does not contend that it did not receive notice that issues related to its alleged misconduct in the original investigations would be addressed, nor does it contend it was not afforded an opportunity to be heard on these issues.  "It is well settled that procedural due process guarantees do not require full-blown, trial type proceedings in all administrative determinations."  *PPG Indus., Inc. v. United States*, 13 CIT 183, 189, 708 F. Supp. 1327, 1332 (1989) (citing *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976)).  As such, and because ITC complied with this court's instructions on remand, the conduct of those proceedings is sustained.

I.      *Best Information Available*[6]

      A.      *The ITC's finding that the Conspirators' failure to reveal the existence of the price-fixing conspiracy "significantly impeded" the ITC's original investigations and thus justified the use of best information available is in accordance with law*

On reconsideration, the ITC found that, by failing to reveal the existence of an agreement to create a floor price for domestic ferrosilicon, i.e., the price-fixing conspiracy, during the original investigations, certain domestic producers had made misrepresentations and omitted information that "affected central issues in the original investigations pertaining to the relevant conditions of competition in the domestic industry, pricing of the like product, and factors that affected pricing of the like product." Reconsideration Determination at 20.[7] The Reconsideration Determination sets out these misrepresentations and omissions. *See id*. at 13–19. For example, one questionnaire asked the domestic producers to "'describe the quoting process for [their] contracts or agreements for ferrosilicon,'" and to "'[i]nclude factors

---

      [6]      As the petitions in the original investigations were filed before January 1, 1995, the amendments made by the Uruguay Round Agreements Act ("URAA") were not applicable to the original determinations. *See Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995). Thus, on reconsideration the pre-URAA version of 19 U.S.C. § 1677e(c) continued to apply.

      [7]      In the Reconsideration Determination, the ITC found that Elkem, American Alloys, SKW, AIMCOR, and Globe engaged in serious misconduct that called into question the veracity and reliability of the pricing information contained in the petitions, testimony, and questionnaire responses submitted on behalf of the domestic industry in the original investigations. *See* Reconsideration Determination at 9–10, 23. In the Remand Determination, the ITC adopted "all findings [it] made in the [Reconsideration Determination] with respect to party misconduct, except for findings pertaining to AIMCOR and Globe," Remand Determination at 6, which companies it determined "were not culpable of material misrepresentations or omissions during the original [ITC] investigations . . . ." *Id*. at 10. No party disputes the ITC's finding exonerating AIMCOR and Globe; thus, it is sustained. The court cannot agree with CCMA's contention, however, that the ITC's finding that CCMA engaged in misconduct is not supported by substantial record evidence, *see* CCMA Comments at 20, in light of the discussion *infra* that it "significantly impeded" the ITC's investigation.

considered in determining [their] initial quotes and explain any trends in [their] quotes during the period January 1989 – March 1992 . . . .'" *Id*. at 17 & n.51 (quoting June 1992 ITC Producers' Questionnaire, Question V.C.1); *see, e.g.*, Non-Pub. R. List 2, Doc. 9 at 38. Another questionnaire asked the following question: "'To avoid losing sales to competitors selling ferrosilicon imported from (the subject countries) during any of the (POI) did your firm – [r]educe prices . . . or [r]oll back announced price increases?'" *Id*. at 18 & n.52 (quoting Question V-E; Question V-C); *see, e.g.*, Non-Pub. R. List 2, Doc. 7 at 45. In their responses, the Conspirators did not reveal the existence of an agreement to create a floor price, but rather indicated that prices were set by market forces. Reconsideration Determination at 11–12; *id*. at 3 ("U.S. producers that participated in the investigations actively advocated that the U.S. ferrosilicon market was driven by unfettered price competition."). In this way, the ITC found that "the producers concealed, if not manipulated, a competitive issue relevant to the Commission's evaluation of the meaning and significance of the observed market data." *Id*. at 19. Thus, the ITC concluded that "[b]y such conduct, these producers significantly impeded, undermined, and compromised the integrity of the Commission's investigations" and invoked its authority to use "best information otherwise available" ("BIA"), pursuant to 19 U.S.C. § 1677e(c) (1988). *Id*. at 21.

The statute governing the ITC's reconsideration authorized the ITC, under certain circumstances, to use BIA:

> In making [its] determinations under this subtitle, . . . the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and

> in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

19 U.S.C. § 1677e(c). It has been held that the use of BIA may be warranted where "answers to questions do not fully or accurately supply the information requested," *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1572 (Fed. Cir. 1990),[8] or where a party refuses to timely produce requested information and thereby significantly impedes the investigation. *See Mitsubishi Heavy Indus., Ltd. v. United States*, 17 CIT 1024, 1031–32, 833 F. Supp. 919, 926 (1993); *Chung Ling Co. v. United States*, 16 CIT 843, 847, 805 F. Supp. 56, 62 (1992) ("*Chung Ling II*") (applying 19 U.S.C. § 1677e(b) (1982) and citing *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1560 (Fed. Cir. 1984)) ("There can be no question that the Commission is allowed to – indeed *must* – use BIA 'under the circumstances enumerated in the statute.'" (emphasis in original)); *Ceramica Regiomontana*, 10 CIT at 406, 636 F. Supp. at 967 (sustaining use of BIA, pursuant to 19 U.S.C. § 1677e(b) (1982), in countervailing duty investigation where questionnaire responses found to be "inaccurate in significant and material respects"). "The court's role is not to determine whether the information chosen was the 'best' actually available," but rather whether the agency's choice is supported by substantial evidence and in accordance with law. *Manifattura Emmepi S.p.A. v. United States*, 16 CIT 619, 623, 799 F. Supp. 110, 114 (1992) (citations omitted); *see also Asociacion Colombiana de Exportadores de Flores v. United States*, 23 CIT 148, 158, 40 F. Supp. 2d 466, 476 (1999) (noting agency's "broad discretion in determining what information to use once it establishes that the application of BIA is appropriate." (citations

---

[8] The *Olympic Adhesives* court applied 19 U.S.C. § 1677e(b) (1982), which was redesignated as 19 U.S.C. § 1677e(c) in 1988, upon enactment of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418 § 1331(1) (codified as amended at 19 U.S.C. § 1677e).

omitted)). As the Court of Appeals for the Federal Circuit has stated:

> Noncooperation by parties or other persons may . . . be penalized, at least in the eyes of those parties or persons, by the ITC's mandatory use of whatever other best information it may have available. In short, one may view the best information rule . . . as an investigative tool, which that agency may wield as an informal club over recalcitrant parties or persons whose failure to cooperate may work against their best interest.

*Atl. Sugar*, 744 F.2d at 1560. An agency's authority to use BIA, however, is not unlimited. *See Olympic Adhesives*, 899 F.2d at 1572 (quoting *Atl. Sugar*, 744 F.2d at 1560) ("[T]he ITA has not been given power that can be 'wielded' arbitrarily as an 'informal club.'"); *Novachem, Inc. v. United States*, 16 CIT 782, 785, 797 F. Supp. 1033, 1036 (1992) (citing *Olympic Adhesives*, 899 F.2d at 1574) ("[T]he best information available statute requires noncompliance with an information request before [the agency] may resort to the best information available."); *see also Manifattura Emmepi*, 16 CIT at 624, 799 F. Supp. at 115 ("[An agency's] authority to select best information otherwise available is subject to a rational relationship between data chosen and the matter to which they are to apply.").

There is little doubt that the use of BIA was warranted under the circumstances presented here. No credible argument can be made that the ITC questionnaires were answered truthfully and responsively. It is uncontested that the questionnaires distributed to the domestic producers requested information pertaining to the way in which domestic prices for ferrosilicon were determined.[9] None of the Conspirators revealed the agreement to create a floor price in their

---

[9]     Indeed, Elkem, through its counsel, conceded the questionnaire responses were deficient:

(continued...)

questionnaire responses. Rather, "the Commission was told repeatedly that prices in the

ferrosilicon market were established solely on the basis of marketplace competition." Remand

Determination at 5. In light of the importance of the price effects element of the ITC's material

injury analysis in the original investigations and "the price-sensitive nature of competition among

ferrosilicon suppliers" the ITC found to exist in the original investigations, *see* Reconsideration

---

[9](...continued)

> [Elkem] . . . [doesn't] contest . . . that the fact of the antitrust
> violations should have been disclosed to this Commission in its
> original decision. We think that the Commission should have been
> given an opportunity to address all of the issues we talked about
> today back then.

Remand Tr., Pub. R. List 1, Doc. 578R at 49:22–25, 50:1–2 (Mr. John W. Nields, Jr.). At oral
argument, the following exchange occurred between the court and counsel for Elkem:

Court:         [I]s it, in fact, the case that during the course of the initial investigation . . .
               representations were made that the prices were determined by market forces?

Mr. Nields:    I believe representations generally of that nature were made.

Oral Argument Tr. at 20:6–11. Counsel for CCMA, however, made the remarkable argument
that his client answered the questionnaires truthfully:

> [O]ur view is we didn't omit anything. We told it like we saw it.
> There was competition in the marketplace. I don't think anybody
> listening to the record in this case could come away believing that
> there was not strong competition, at least between the imports and
> the domestics, and also among the domestics.

*Id*. at 60:4–10 (Mr. Stephen L. Gibson). Counsel for CCMA stated his client's position as
follows: "Our position is that whatever meetings there were did not rise to the level of a price-
fixing conspiracy, and that the thing was doomed to failure." *Id*. at 58:16–18. The court finds
CCMA's position difficult to credit. CCMA's predecessor, SKW, was, in fact, a member of the
price-fixing conspiracy and was convicted of conspiring to fix prices. It is undisputed that SKW
did not disclose the conspiracy to the ITC. At the time SKW answered the questionnaire it was
engaged in a conspiracy the purpose of which was to distort competition in the sale of its
product. That the conspiracy may not have worked precisely as planned does not make CCMA's
answers truthful.

Determination at 28 (internal quotation omitted), the ITC reasonably concluded that the failure of

the Conspirators to divulge the existence of the price-fixing conspiracy "significantly impeded"

its investigation within the meaning of 19 U.S.C. § 1677e(c). *See Chung Ling II*, 16 CIT at 847,

805 F. Supp. at 62; *Olympic Adhesives, Inc.*, 899 F.2d at 1572 (resort to BIA justified where

"answers to questions do not fully or accurately supply the information requested . . . ."). Indeed,

it is difficult to think of a situation where the use of the "informal club," *Atl. Sugar*, 744 F.2d at

1560, of BIA might be more warranted. Thus, the court finds that the ITC properly exercised its

authority to use BIA, pursuant to 19 U.S.C. § 1677e(c).

B.      *The ITC's findings, using best information available, are supported by substantial
        evidence on the record*

The question remains whether the ITC's findings, reached through the use of BIA, are

supported by substantial evidence. Because of the failure to disclose the price-fixing conspiracy,

the ITC determined that it could not rely on the pricing information submitted by the domestic

producers, and, thus used "facts otherwise available" in making the following findings.[10] *See*

Reconsideration Determination at 31. First, the ITC found that "[f]errosilicon prices reached a

peak in 1989 when demand was exceptionally high." *Id*. Second, it found "[d]emand declined

significantly from 1990 to 1991 due to a recession that reduced demand for the products in which

ferrosilicon was used as an input; consequently, prices fell as well, although only to historically

average levels." *Id*. The ITC thus concluded that these facts "indicate[d] that a reason for the

price depression was the business cycle for ferrosilicon," rather than underselling by subject

_____

[10]      While the ITC used the more modern term "facts otherwise available" in the
Reconsideration Determination, it undoubtably meant BIA.

imports. *Id*.

In the Remand Determination the ITC affirmed these findings, observing that "declines in ferrosilicon prices from 1989 to 1991 largely parallel changes in demand" and that "in 1992, when demand increased somewhat, there were also price increases for some domestically produced ferrosilicon products." Remand Determination at 26. The ITC supplemented this demand analysis with an examination of U.S. apparent consumption, which has two components: imports and U.S. producers' shipments. *See* Rebuttal Comments of ITC Supp. Remand Determination ("Rebuttal Comments") at 29 n.13. It determined that consumption "declined by 5.1 percent from 1989 to 1990 and by 12.4 percent from 1990 to 1991," and that despite increases in consumption between 1991 and 1992 the evidence showed that "the 1992 apparent consumption quantity was still below that of 1989 or 1990." *Id*. at 25–26. The ITC continued:

> In instances of falling demand, we would generally expect prices to decline. This is particularly true in light of the difficulty in modulating ferrosilicon production to reflect changes in demand. Ferrosilicon is produced in furnaces that must be continuously run and cannot be easily and quickly be switched to or from production of other products.

*Id*. at 26. To substantiate its conclusions the ITC cited: (1) Economic Memorandum EC-Q-025 (Mar. 9, 1993), Non-Pub. R. List 2, Doc. 755R ("Economic Memorandum"); (2) the staff report prepared in connection with the ITC's final determination in Ferrosilicon From the P.R.C., Inv. No. 731-TA-567 (Final), USITC Pub. 2606 (Mar. 1993), Pub. R. List 1, Doc. 374 ("China Staff Report"); and (3) data contained in the staff report prepared on remand. *See* Staff Report, Ferrosilicon From Braz., China, Kaz., Russ., Ukr., Ven., Invs. Nos. 303-TA-23, 731-TA-

566–570, and 731-TA-641 (Final) (Reconsideration) (Remand), Non-Pub. R. List 2, Doc. 797R

("Remand Staff Report").

Elkem challenges the ITC's analysis of demand trends, in particular taking issue with the ITC's calculation of U.S. apparent consumption figures on remand. Elkem asserts that the ITC "reworked its old data" to show "a *decline* in consumption from 1989 to 1990 . . . by including categories of apparent consumption in the 1989 apparent consumption number that were not included in the apparent consumption numbers for 1990 through 1992." Pub. Comments of Elkem on ITC Remand Determination ("Elkem Comments") at 13 (emphasis in original). In doing so, Elkem alleges, the ITC increased the 1989 number and created the "misleading impression that demand declined from 1989 to 1990 when in fact it increased." *Id*. Elkem also argues that the 1989 U.S. apparent consumption figure includes U.S. shipment volumes for ten U.S. producers, while the apparent consumption figures for 1990, 1991, and 1992 include only seven U.S. producers' shipment volumes. *Id*. at 14.

The ITC responds to these arguments as follows. First, it asserts that the data Elkem contends more accurately reflect U.S. apparent consumption during the 1989 to 1991 period, in fact, confirm the ITC's finding that "there was a sharp decline in U.S. apparent consumption" during that period. Rebuttal Comments at 28 (citing Elkem Comments, Non-Pub. Ex. E). Second, the ITC asserts that Elkem did not raise any concerns about the accuracy of the 1990 and 1991 apparent consumption data on remand, even though such data were made available to Elkem and were subject to comment. *Id*. at 28–29. Finally, the ITC explains that, in any event, it

used data from the February 1993 staff report to calculate 1989 U.S. apparent consumption because the October 1993 staff report, from which the data for 1990, 1991, and 1992 were taken, did not contain data for 1989.[11] *Id*. at 29 n.13. The ITC does not dispute that the February 1993 and October 1993 Staff Reports calculate import volume based on different data—the February report used questionnaire data collected from Plaintiffs in calculating import volume, and the October report used official import statistics. *Id*. The ITC contends that the 1989 data were properly recalculated using these official import statistics. In addition, the ITC explains that it used shipment data for three U.S. producers in 1989 that it did not use for subsequent years because those producers ceased production in 1989. *Id*. (citing October 1993 Staff Report at 27 n.53).

The court finds that the ITC's BIA record evidence reasonably supports its findings with respect to pricing. Data compiled from domestic producers' questionnaire responses in the original investigation of ferrosilicon from China revealed that the domestic industry experienced a decline in demand from 1989 to 1991. As summarized in the China Staff Report:

> The demand for ferrosilicon is directly tied to the steel and foundry industries. Although the United States is the third largest steel producer in the world, weak demand from the construction, automotive, and appliance sectors contributed to a decline in steel

---

[11] The February 1993 staff report was prepared in connection with the final investigation concerning ferrosilicon from China, which data were incorporated into the final staff report in Ferrosilicon From Braz., Egypt, Kaz., P.R.C., Russ., Ukr., and Ven., Invs. Nos. 303-TA-23 (Final), 731-TA-566–570 (Final), and 731-TA-641–642 (Prelim.) (Feb. 17, 1993), Non-Pub. R. List 2, Doc. 774R ("February 1993 Staff Report"). *See* Remand Staff Report at II-2 n.6. The October 1993 staff report related to the final investigation of ferrosilicon from Brazil and Egypt. *See* Staff Report, Ferrosilicon From Braz. and Egypt, 731-TA-641–642 (Final) (Oct. 7, 1993), Non-Pub. R. List 2, Doc. 769R ("October 1993 Staff Report").

output from 1989 to 1991. The steel industry had experienced high
growth in 1988, but production decreased in 1989 as the rate of
general economic growth slowed.

China Staff Report at I-13; Remand Determination at 25 & n.80. Moreover, as would be

expected in an environment of declining demand and more or less consistent supply, the data

show that from 1989 to 1991, prices for ferrosilicon fluctuated and generally decreased. As

summarized in the Remand Staff Report:

> Quarterly prices of the domestic and applicable subject imported
> ferrosilicon fluctuated but generally fell from period highs during
> the first half of 1989 through much of the remaining period, before
> generally showing a tendency to turn up somewhat during April-
> September 1992. . . . Weakened U.S. iron and steel production in
> 1990 and a decline in 1991 led to weakened and then reduced U.S.
> demand for ferrosilicon, which, in turn, likely contributed to
> further declines in U.S. ferrosilicon prices during 1990 and 1991.

Remand Staff Report at III-7, -22. In addition, the record evidence confirms that the domestic

industry experienced an overall decline in apparent consumption. The China Staff Report

summarized the data on apparent consumption as follows:

> Total U.S. consumption, by quantity, decreased by 13.0 percent
> from 1989 to 1991, but increased 25.7 percent between the interim
> periods. In terms of value, total reported U.S. consumption fell by
> 31.9 percent from 1989 to 1991, but rose by 11.5 percent from
> January-September 1991 to January-September 1992. . . .
> [A]pparent consumption (by quantity) decreased 12.1 percent from
> 1989 to 1991, but rose 10.8 percent between the interim periods.

China Staff Report at I-13 & tbl. 1 (compiled from questionnaire responses and official statistics

of the United States Department of Commerce). The court has also reviewed the confidential

Economic Memorandum and finds that it supports the notion that it is difficult to switch from

ferrosilicon production to production of other products or vice versa. *See* Economic

Memorandum at 23.  Thus, the court finds that the requisite "rational relationship between data chosen and the matter to which they are to apply" exists.  *See Manifattura Emmepi*, 16 CIT at 624, 799 F. Supp. at 115.

In addition, the court finds Elkem's attempts to undermine the ITC's calculation of apparent consumption for 1989 unavailing.  While Elkem alleges that the ITC improperly included categories of apparent consumption in its computation of the 1989 figure, both the ITC's data and Elkem's proposed "corrected" data indicate a general decline in U.S. apparent consumption from 1989 to 1991.  *See* Elkem Comments, Non-Pub. Ex. E.  The ITC reasonably relied on the February 1993 Staff Report for 1989 data as the October 1993 Staff Report did not include data for 1989.  Finally, it was reasonable for the ITC to use official import statistics for 1989 in computing U.S. apparent consumption for that year, where such statistical information was also relied upon in calculating U.S. apparent consumption for subsequent years.  Using this data is surely within the ITC's discretion considering the ITC's justified use of BIA.  While the ITC acknowledges that "[t]he 1989 data presented in [the February 1993 Staff Report] differ marginally" from data contained in its Remand Staff Report, the difference is not sufficiently great to find the conclusions unsupported by substantial evidence.  *See* Remand Staff Report at II-2 n.6; *Chefline Corp.*, 26 CIT at __, 219 F. Supp. 2d at 1305.  While Elkem offers different interpretations of the evidence than those made by the ITC, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo*, 383 U.S. at 620 (citations omitted).  Thus, the ITC's use of BIA is lawful and its findings based thereon are supported by substantial

evidence on the record.

II.     *Adverse Inferences*

        A.      *The ITC's authority to make adverse inferences under pre-URAA law*

Under the relevant pre-URAA regulation, the ITC had the authority to make adverse

inferences, where warranted: "[W]henever a party . . . refuses or is unable to produce information

requested in a timely manner and in the form required, or otherwise significantly impedes an

investigation, the Commission may use the best information otherwise available in making its

determination; . . . [and] make inferences adverse to such person's position . . . ."  19 C.F.R. §

207.8 (1992), (1993)[12]; *Chung Ling Co. v. United States*, 16 CIT 636, 640, 805 F. Supp. 45, 49

(1992) ("*Chung Ling I*") (noting that "lack of cooperation in responding to the questionnaires is a

sound basis for drawing an adverse inference against the domestic industry.").  In *Alberta Pork*

*Producers' Marketing Board v. United States*, 11 CIT 563, 669 F. Supp. 445 (1987), the court

held that "the Commission has discretion in deciding whether or not to draw an adverse inference

with respect to injury based upon a party's failure to participate in the administrative proceeding,

but the decision in either event must be based upon a sound rationale."  *Alberta Pork*, 11 CIT at

580, 669 F. Supp. at 459.  The adverse inference rule was summarized as follows: "'[W]hen a

party has relevant evidence within his control which he fails to produce, that failure gives rise to

an inference that the evidence is unfavorable to [that party].'"  *Id*. (quoting *Int'l Union (UAW) v.*

*NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972)).  In *Rhone Poulenc, Inc. v. United States*, 899 F.2d

---

[12]      The court notes that 19 C.F.R. § 207.8 (1992) and 19 C.F.R. § 207.8 (1993), the regulations in force at the time the ITC made its final determinations with respect to ferrosilicon imports from the Subject Countries, contain identical language.

1185, 1190 (Fed. Cir. 1990), the Court of Appeals for the Federal Circuit found that the

presumption that "the highest prior margin was the best information of current margins" was a

permissible interpretation of 19 U.S.C. § 1677e(c). *Rhone Poulenc*, 899 F.2d at 1190. In

upholding this presumption, the court cited the rationale underlying the adverse inference rule,

i.e., that the presumption "reflects a common sense inference that the highest prior margin is the

most probative evidence of *current* margins because, if it were not so, the importer, knowing of

the rule, would have produced current information showing the margin to be less." *Id.* (emphasis

in original).

 

        B.      *The adverse inference that the price-fixing conspiracy affected prices during the*
                  *Conspiracy Period is in accordance with law and supported by substantial*
                  *evidence*

As with BIA, here, the determinative factor in deciding if the ITC was justified in making

an adverse inference with respect to the effect of the price-fixing conspiracy is whether the

Conspirators significantly impeded the investigation. *See* 19 C.F.R. § 207.8. Thus, in keeping

with its finding with respect to BIA that the Conspirators significantly impeded its investigation

by withholding information essential to its material injury analysis, the ITC made the adverse

inference that "the underselling and lost sales were a function of the domestic industry's own

actions – namely attempts to establish minimum prices." Reconsideration Determination at 31.

In other words, on reconsideration the ITC made the adverse inference that the price-fixing

conspiracy affected domestic prices while the conspiracy was in effect.

On remand, the ITC affirmed its finding that the conspiracy affected prices during the

Conspiracy Period. In doing so, however, the ITC did not rely on adverse inferences alone.

Rather, in support of this finding, the ITC cited data contained in the Remand Staff Report with

respect to the frequency of underselling before, during, and after the Conspiracy Period. *See*

Remand Determination at 18 & nn.57–58 (citing Remand Staff Report tbls. III-1–6, -7a–c, -8a–c,

-9a–b). Analyzing these data, the ITC found that for the Conspirators the frequency of

underselling was "significantly higher during the conspiracy period than during the preceding or

following period," *id*. at 18:

> For the three conspirators, the frequency of underselling based on
> delivered prices was 80 percent (24 of 30 comparisons) during the
> conspiracy period (the fourth quarter of 1989 through the second
> quarter of 1991) and 61.8 percent (21 of 34 comparisons) during
> the non-conspiracy period. . . . We emphasize that this analysis is
> not an underselling analysis conducted pursuant to 19 U.S.C. §
> 1677(7)(C)(ii)(II) (1988). Instead, our purpose is to examine all
> available data in the record as to whether the price fixing
> conspiracy actually affected prices for domestically produced
> ferrosilicon, in response to the CIT opinion directing these remand
> proceedings.

*Id*. 18 n.57 (citing Remand Staff Report tbls. III-1–6, -7a–c, -8a–c, -9a–b). The ITC found that

the higher incidence of underselling during the Conspiracy Period was "consistent with the

theory that the conspiracy would tend to inflate the conspirators' prices as compared to the fair

price that would have otherwise been established in the U.S. market during the time of the

conspiracy." *Id*. at 18.

In accordance with the court's instruction in *Elkem IV*, on remand, the ITC also

considered evidence submitted by Elkem and CCMA with respect to the issue of whether the

conspiracy affected prices during the Original POI. In doing so, the ITC rejected, as unprobative,

an economic report prepared by Dr. Joseph P. Kalt[13] and certain results from the civil and

criminal antitrust cases.  Remand Determination at 15, 16; Pub. Prehearing Br. of Elkem, Pub. R.

List 1, Doc. 569R, Ex. 1, Aff. of Joseph P. Kalt ("Kalt Report").

Elkem and CCMA object to the ITC's finding that the conspiracy affected prices during

the Conspiracy Period.  Elkem asserts that adverse inferences "may not be used[] to reach an

incorrect factual determination . . . ."  Elkem's Mem. Supp. Mot. J. Agency R. ("Elkem Mem.")

at 25.  Elkem contends that "the record as a whole left no room for doubt that the dumped

imports were a cause of grievous injury to the domestic ferrosilicon industry."  *Id*. at 27.  In this

connection, Elkem claims that the ITC improperly rejected the Kalt Report on remand and the

results of the trial courts in the antitrust litigations.  According to Elkem, such evidence

illustrates that the conspiracy was "largely ineffective" and undermines the ITC's finding that the

conspiracy affected domestic prices.  Elkem Comments at 16.  Thus, Elkem argues that the ITC's

use of adverse inferences to find that the conspiracy affected prices during the Conspiracy Period

is neither supported by substantial record evidence nor in accordance with law.

The ITC insists that the adverse inference it chose was based on a sound rationale.  First,

it maintains that under the circumstances "it was reasonable for the ITC to disregard entirely the

pricing information that the domestic producers submitted [during the Original POI] and rely on

---

[13]      At the time Dr. Kalt authored his report, he served as the Ford Foundation
Professor of International Political Economy at the John F. Kennedy School of Government,
Harvard University, and a senior economist at Lexecon, Inc., an economics consulting firm. *See*
Kalt Report at 1.

adverse inferences" on reconsideration. ITC's Mem. Opp'n Pls.' Mot. J. Agency R. at 23.

Moreover, the ITC argues that it properly rejected the Kalt Report and the findings from the

antitrust litigations. With respect to the Kalt Report, the ITC points out that it "expressly stated

[in the Remand Determination] that Dr. Kalt's market structure analysis could not be reconciled

with information in the record indicating that the domestic industry's loss of market share was

attributable solely to three conspirators and to small producers that ceased production in 1989."

Rebuttal Comments at 20 (citing Remand Determination at 25 n.76). In addition, the ITC

disputes the probative value of District Judge William M. Skretny's finding, which was made for

the purpose of sentencing, that prices of commodity ferrosilicon were not affected except during

eleven weeks of the Conspiracy Period. The ITC argues that "[t]his was not, as plaintiffs

maintain, a finding that the conspiracy was ineffective during the remaining period – only a

conclusion that the government had not satisfied its burden to prove the effects of the

conspiracy." *Id*. at 17. The ITC disputes the probative value of the civil litigation verdict that

certain specialty steel producers had not suffered damages as a result of American Alloys's

participation in the price-fixing conspiracy on the grounds that "[t]he verdict did not pertain to all

ferrosilicon purchasers . . . [n]or did it encompass all the conspirators . . . ." *Id*. Thus, the ITC

contends that "the litigation results selected by plaintiffs establish merely that CCMA/SKW and

American Alloys had each obtained a favorable verdict in one respective piece of litigation." *Id*.

at 18.


The court finds the ITC's use of adverse inferences, for the Conspiracy Period, to be in

accordance with law. As discussed *supra*, the ITC properly determined that Conspirators' failure

to reveal the price-fixing conspiracy significantly impeded the investigation. This failure serves as a basis for the use of BIA, and as a valid justification for the taking of adverse inferences. *Chung Ling I*, 16 CIT at 640, 805 F. Supp. at 49. In addition, the adverse inference taken here, i.e., that the underselling and negative price effects experienced by the domestic industry were a product of the domestic producers' own actions, conforms with the rationale behind the adverse inference rule—"'when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to [that party].'" *Alberta Pork*, 11 CIT at 580, 669 F. Supp. at 459 (internal quotation omitted); *see also Rhone Poulenc*, 899 F.2d at 1190–91 ("The agency's approach fairly places the burden of production on the importer, which has in its possession the information capable of rebutting the agency's inference.").[14]

In addition, the court finds that the ITC's underselling finding is supported by substantial evidence on the record. The ITC compared the prices of domestic ferrosilicon charged by the Conspirators with the prices of imported ferrosilicon and observed that during the Conspiracy Period, imports of ferrosilicon undersold the domestic product more frequently than in the months preceding and following the conspiracy. *See* Remand Determination at 18–19 (citing

---

[14] Moreover, the court finds unconvincing Elkem's argument that adverse inferences cannot be used where the relevant information sought was later produced and present before the agency. *See* Elkem Mem. at 27–28. Here the court is reviewing a determination reached on reconsideration, not a new proceeding. That the Conspirators complied with the ITC's requests for information concerning the price-fixing conspiracy in the context of the reconsideration does not cure their earlier failures, and the ITC's continued use of adverse inferences remains proper. *See* 19 U.S.C. § 1677e(c) (response to information request must be timely). This is particularly the case in the circumstances present here, where the nature of the information withheld went to the heart of the ITC's analysis in the original final determinations.

Remand Staff Report tbls. III-1–6, -7a–c, -8a–c, -9a–b). While it may be the case that certain information on the record could be interpreted to reach a conclusion different than the one reached by the ITC, the court will nevertheless uphold the agency's determination if it is substantiated by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 229; *see also Consolo*, 383 U.S. at 620 ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (citations omitted)). The court finds that the evidence cited by the ITC fairly supports its conclusions with respect to the effect of the conspiracy during the Conspiracy Period based on these comparisons.

The evidence submitted on remand by Plaintiffs does not compel a different finding. Turning to the Kalt Report, the court notes that in conducting his analysis, Dr. Kalt examined the same record evidence that the ITC did in the course of its investigation, although he came to different conclusions. *See* Kalt Report at 4 (indicating that Dr. Kalt "had access to all of the record evidence now before the ITC, including from its original investigations, its changed circumstances reviews, its reconsideration proceedings in 1999, and the materials from the antitrust litigation that have been brought into the record evidence of the ITC."). Dr. Kalt did not dispute the accuracy of the ITC's data concerning price. *See id*. at 28. Rather, he interpreted the data differently than did the ITC.

Three examples suffice to make this point. First, the ITC and Dr. Kalt arrived at different conclusions concerning the relative positions of power occupied by the Conspirators and

nonconspirators. The ITC concluded that the Conspirators "collectively represented a significant

majority of U.S. production throughout the original periods of investigation" such that they

occupied a "dominant position in the domestic industry" and that "factors that affected their

prices [i.e. the price-fixing agreement,] would affect prices of the industry as a whole, including

those of the nonconspirators . . . ."[15] Remand Determination at 10, 19. Dr. Kalt, in contrast,

concluded that

> [d]ozens of sellers of ferrosilicon, not the least of these being the
> many producers and brokers of imported ferrosilicon, were outside
> of the price floor agreement of certain U.S. producers. These non-
> participant sellers demonstrably competed vigorously to sell in the
> U.S. marketplace. Moreover, they demonstrably were able to vary
> their supplies in response to more or less attractive prices. Such
> conditions rendered the price agreement by three U.S. ferrosilicon
> producers to set floor prices ineffective.

Kalt Report at 5. Dr. Kalt's conclusion, however, appears to make the ITC's point, i.e., that the

Conspirators' attempts to keep the price of ferrosilicon up allowed foreign producers to undersell

them.

Second, Dr. Kalt and the ITC reached different conclusions with respect to the effect of

the Conspirators' behavior on the domestic market. The ITC not only emphasized in the Remand

Determination that the mere existence of the conspiracy was sufficient to justify the use of

adverse inferences regarding the conditions of competition in the industry, but also performed its

---

[15]     In addition, the ITC concluded on remand that its finding exonerating AIMCOR and Globe "does not undercut the findings the Commission made in its 1999 opinion concerning either the pervasiveness or the significance of the misrepresentations and omissions that domestic ferrosilicon producers made during the original investigations" because "they both were relatively small producers" compared with the Conspirators. Remand Determination at 10.

demand and underselling analyses discussed *supra*. Remand Determination at 14. In contrast, a large portion of the Kalt Report is devoted to demonstrating that the conspiracy was not "successful" in maintaining the price floor.[16] It is worth noting, however, that for the price-fixing conspiracy to have provided foreign competitors with a price advantage, it is not necessary for it to have been "successful" in maintaining the price floor, but only that it kept some domestic producers' prices higher than they would have otherwise been. This conclusion appears to have been fully justified by the ITC's analysis. In addition, this is, in part, the conclusion reached by Judge Skretny who found that the conspiracy was effective during a portion of the time it was in effect. *See* Non-Pub. R. List 2, Doc. 776R, Fig. 13a.

Third, with respect to the record evidence concerning an observed decrease in demand and a correlative drop in prices during the Original POI, as noted in the BIA discussion *supra*, the ITC came to the conclusion that "a reason for the price depression was the business cycle for ferrosilicon." Reconsideration Determination at 31. Dr. Kalt disagreed with the suggestion that "declining domestic and import prices can[] be attributable *solely* to demand conditions." Kalt Report at 29 (emphasis added). Rather, he concluded that

---

[16]     *See* Kalt Report at 6 ("A successful price fixing agreement would not fix prices at less than costs, and any upward pressure on prices that such an agreement might be asserted to have had would mean, if anything, that absent the agreement, domestic producers' prices would have been even further below cost than actually observed."); *id*. at 13 ("Success in raising prices through price fixing, for example, would not explain domestic producers finding it necessary to sell at prices below costs in order to meet competition from rising imports. Such financial conditions would still provide a sound basis for concluding that imports were materially injuring the domestic industry."); *id*. ("It is recognized in economics that *agreeing* to fix prices and *succeeding* are not the same.") (emphasis in original); *id*. at 14 ("[T]hese imports overwhelmed the prospect of successfully establishing price floors."); *id*. at 22 ("It is clear, however, that there is no pattern of prices successfully being maintained at a common floor.").

> [i]t follows from the basic economics of supply and demand that,
> for any given demand conditions, had low-priced imports not been
> so abundantly supplied to the U.S. market, prices would have been
> higher in that market and such material injury to domestic
> producers as below-cost selling would have been mitigated.

*Id.* That the ITC and Dr. Kalt reached different conclusions with respect to the significance of the effect of declining demand on prices does not prevent the court from sustaining the ITC's finding, so long as it is supported by substantial record evidence.

This court finds that the Conspirators' misconduct was sufficient to justify the ITC's findings with respect to the effect of the conspiracy on prices during the Conspiracy Period, and that Plaintiffs have not demonstrated that the inferences made were used to reach conclusions that were, in fact, untrue. It is well settled that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620. As the accuracy of the pricing data is not in dispute, Elkem and CCMA have done no more than urge a different interpretation of the evidence from that expressed by the ITC. The record, however, reasonably supports the conclusions drawn by the ITC with respect to underselling and the overall decline in prices during the Original POI. With respect to the ITC's rejection of selected antitrust litigation results and findings and Elkem's and CCMA's claims that the ITC was somehow bound by such findings, the ITC is charged by Congress to administer the trade laws, and make its own findings, by means of its own investigations with respect to material injury. *See, e.g.,* 19 U.S.C. §§ 1673d(b) ("The Commission shall make a final determination of whether . . . an industry in the United States . . . is materially injured, or . . . is threatened with material injury, or . . . the

establishment of an industry in the United States is materially retarded, by reason of imports [of subject merchandise].”); *see also Chung Ling II*, 16 CIT at 849, 805 F. Supp. at 63 (“[I]n an injury investigation by the Commission domestic producers have no burden of proof . . . but their cooperation in fully responding to questionnaires is essential for the Commission ‘to gather the data needed for an accurate determination.’”) (internal citation and quotation omitted). It is clear from the Remand Determination that the ITC complied with the court’s instructions that “should evidence with respect [to whether the conspiracy actually affected prices] be presented during the course of the further proceedings on remand, the ITC shall consider such evidence as it would consider any other evidence on the record.” *Elkem IV*, 26 CIT at __, 193 F. Supp. 2d at 1325. The ITC examined the Kalt Report but did not find it probative. Remand Determination at 16 (“We have examined Dr. Kalt’s analysis carefully and find that it lacks probative value for purposes of these proceedings.”). In the end, the Report is evidence, but not conclusive evidence. Thus, as the ITC’s use of adverse inferences has been justified by the Conspirators’ behavior, and the Plaintiffs having failed to demonstrate that the findings based on these inferences are factually incorrect, these findings are sustained.

C.      *The ITC’s use of an adverse inference for the time period outside the Conspiracy Period is not supported by substantial evidence on the record*

On remand, the ITC took an adverse inference that the conspiracy affected domestic prices not only during the Conspiracy Period, but also during the periods preceding and following the Conspiracy Period. Remand Determination at 19–20 (“[W]e have taken an adverse inference that the conspiracy affected prices during those portions of the period of investigation where

there has been no judicial finding that the conspiracy was in effect."). Thus, the ITC concluded

that the conspiracy affected prices during the entire Original POI. *Id*. at 19. The ITC explained

that "[a]nalysis that would focus on periods when the conspiracy may not have been in effect, or

only on transactions involving nonconspirators, would merely serve to reward American Alloys,

CCMA, and Elkem for making material misrepresentations and omissions which continue to

pervade the current record." *Id*. at 20.

The ITC also provided a separate basis for its finding that the conspiracy affected prices

during a period of time outside that in which there was a judicial determination that the

conspiracy existed. Remand Determination at 21. The ITC stated:

> The Commission has the discretion to establish an appropriate time
> frame for its investigations in antidumping and countervailing duty
> proceedings. A substantial portion of the pertinent periods of
> investigation in these proceedings encompasses the period in which
> there are judicial findings concerning, or guilty pleas
> acknowledging, the existence of a price-fixing conspiracy;
> additionally, the guilty pleas of American Alloys and Elkem do not
> state that the conspiracy existed only from the fourth quarter of
> 1989 through the second quarter of 1991. In any event, there is no
> basis to conclude that at some point in 1991 the ferrosilicon market
> transformed overnight from one characterized by price-fixing to
> one characterized by unfettered price competition. Consequently,
> if we were to weigh the evidence in the record concerning those
> portions of the period of investigation where the conspiracy was
> and was not judicially found to be operative, we would still
> conclude that a significant condition of competition affecting
> domestic prices during the original periods of investigation was the
> price-fixing conspiracy.

*Id*. at 21–22.

Elkem contends that the ITC's use of adverse inferences to find that the conspiracy affected prices even where the conspiracy was not found to have existed is not supported by substantial evidence on the record. First, Elkem argues that "there was no missing information concerning the scope or duration of the conspiracy," Elkem Comments at 23; second, the inference is factually inaccurate because "[t]here was no basis in the record for finding that the conspiracy was in place during the entire [Original] POI." *Id*.

The ITC counters that its use of adverse inferences on remand was justified. First, contrary to Elkem's argument, "the record before [the ITC] on conditions of competition was not complete because it did not contain reliable information from the conspirators on how they established the prices during any portion of the original periods of investigation." Rebuttal Comments at 22. Second, "case law does not state that an agency cannot use an adverse inference unless that inference is the most accurate information available," and that "[i]n any event, the inference was based on accurate information in the record *concerning the conspiracy period*. The ITC resorted to such information by necessity because it did not have accurate information from the conspirators concerning how they established prices during any portion of the period of investigation." *Id*. at 23 (emphasis added). Thus, the ITC argues that its "limited" adverse inference "was warranted and in accordance with law." *Id*.

Having determined that the ITC reasonably found that the domestic industry's failure to reveal the price-fixing conspiracy significantly impeded the ITC's investigation, the question remains whether the ITC's finding, vis-à-vis the adverse inference it took on remand, was "based

upon a sound rationale." *See Alberta Pork*, 11 CIT at 580, 669 F. Supp. at 459. It is well settled

that the court can only review the ITC's decision on the basis of the reasons set forth by the

agency. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the

process of review requires that the grounds upon which the administrative agency acted be

clearly disclosed and adequately sustained."). It does not appear that the ITC had a sound

rationale in making the adverse inference that the conspiracy affected prices during the entire

Original POI, and not just during the period in which the conspiracy was actually in effect. In

this respect the court agrees with Elkem that "[t]here was no basis in the record for finding that

the conspiracy was in place during the entire [Original] POI." Elkem Comments at 23. Here, the

ITC itself commenced reconsideration proceedings during which evidence was presented. Much

of the evidence concerned the time frame of the price-fixing conspiracy. None of this evidence

discussed by the ITC in its Reconsideration Determination, however, supports an inference that

the conspiracy existed during the entire Original POI. While the ITC may justifiably conclude

that the "failure [to reveal the conspiracy] gives rise to an inference that the evidence is

unfavorable to" Plaintiffs, it may not use the inference to reach a conclusion that appears to be at

odds with the known facts, *see Alberta Pork*, 11 CIT at 580, 669 F. Supp. at 459, and an attempt

to do so on the part of the ITC cannot be said to be supported by substantial evidence on the

record. "The substantial evidence standard was developed to avoid . . . arbitrary uses of

discretion. Guesswork is no substitute for substantial evidence in justifying decisions." *China

Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States*, 15 CIT 417, 423–24, 771 F. Supp. 407,

413 (1991). Here, there is no suggestion in the evidence cited by the ITC that the conspiracy

commenced prior to October 1989. This being the case, the ITC cannot, using the device of

adverse inferences, invent a price-fixing conspiracy during the period outside the time period during which the conspiracy was and was not found to be in effect, i.e., prior to October 1989 (the start of the Conspiracy Period) and from June 1991 (the end of the Conspiracy Period) to June 1993 (the end of the Original POI). In addition, the ITC cannot construct a conspiracy using the idea that "if" it had in fact "weigh[ed] the evidence in the record concerning those portions of the period of investigation where the conspiracy was not judicially found to be operative," it "would" have concluded that the price-fixing conspiracy was in effect. Thus, the court remands the matter so that the ITC may set forth the evidentiary basis for the adverse inference that the price-fixing conspiracy affected prices throughout the entire Original POI.

On remand the ITC shall revisit its finding with respect to the time period outside of the Conspiracy Period. If it should conclude that its findings on remand with respect to this period are justified it shall: (1) state with specificity the evidence that the price-fixing conspiracy affected prices during the entire Original POI; (2) weigh the evidence in the record concerning those portions of the Original POI where the conspiracy was not judicially found to be operative; and (3) explain with specificity what information in the record, if any, supports the adverse inference made on remand that the conspiracy affected prices during the periods preceding and following the Conspiracy Period.

## Conclusion

For the reasons set forth above, the court remands this matter to the ITC for further proceedings in accordance with this opinion.  Such remand results are due within ninety days of the date of this opinion, comments are due thirty days thereafter, and replies to such comments eleven days from their filing.

_____

Richard K. Eaton

Dated:  June 18, 2003
          New York, New York